NO. 20-6598

**In The**
**United States Court of Appeals**
**For The Fourth Circuit**

**LAMONT McKOY,**

*Petitioner – Appellant,*

**v.**

**ERIK A. HOOKS,**

*Respondent – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**AT RALEIGH**

————————

**APPELLANT'S INFORMAL BRIEF**
————————

Jamie T. Lau
N.C. Bar No. 39842
Wrongful Convictions Clinic
Duke University School of Law
Box 90360
Durham, North Carolina 27708
(919) 613-7764

John P. Nowak
Amanda Pober
Inna Coleman
Katherine Solomon
Mark Russell Sperling
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

*Counsel for Petitioner-Appellant*

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF THE ISSUES...............................................................2

    **Issue One**............................................................................2

    **Issue Two** ..........................................................................2

    **STANDARD OF REVIEW** ...................................................3

    **INTRODUCTION** ................................................................3

    **LEGAL STANDARDS**.......................................................10

    **ARGUMENT** ......................................................................13

**I.**     **Reasonable Jurists Would Debate Whether The District Court Was Correct in its Procedural Ruling.** ........................................13

    **A. Reasonable Jurists Would at Least Find it Debatable Whether McKoy's Petition States a Valid Claim of the Denial of a Constitutional Right**................................................................13

    **1. Talley Tips Were Suppressed.** .................................13

    **2. FPD's Presence at Bryan and Branson was Suppressed Allowing False Testimony from the State's Principal Witness.** 17

    **B. Reasonable Jurists Would at Least Find it Debatable Whether the District Court Erred in its Procedural Ruling** ................................20

    **1. McKoy Presented New Evidence.**................................20

    **2. The District Court Applied a "Sufficiency-of-the-Evidence" Test to the New Evidence, Rather than the Required Holistic Review.** ...................................................................21

**II.**     **The Totality of the Evidence Demonstrates McKoy's Actual Innocence.**..............................................................................25

**A. There Was No Confession.** .................................................................25

**B. The State Relied on False Evidence** ...............................................28

    **1. The Falseness of Williams's Testimony is Reflected in His Erroneous and Inconsistent Account.** ...........................29

    **2. Williams Gave False Testimony in Exchange for a Payment from the Police.** .................................................36

    **3. Police Were Present at the Scene and the FPD Knew It at the Time of McKoy's Trial.** ............................................41

**C. Talley Shot and Killed Hailey** .......................................................42

    **1. Eight Eyewitnesses Identify Talley as the Shooter.** ..................43

    **2. Talley Had and Used The Type of Gun Used in the Hailey Shooting.** .................................................................47

**D. The Witnesses Not Called By the State for McKoy's Trial Are Not Credible** .................................................................48

**E. It is More Likely than Not that No Reasonable Juror Would Find McKoy Guilty Beyond a Reasonable Doubt** .......................49

**CONCLUSION** ...........................................................................................51

    **Appendix A** .........................................................................................52

    **Appendix B** .........................................................................................54

**CERTIFICATE OF COMPLIANCE** .........................................................56

**CERTIFICATE OF FILING AND SERVICE** ...........................................57

# TABLE OF AUTHORITIES

**CASES**

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................17

*Buck v. Davis*, 137 S.Ct. 759 (2017)..........................................................3

*Dennis v. Sec. of Pa.*, 834 F.3d 263 (3d. Cir. 2016) ................................17

*Figgs v. North Carolina*, No. 5:16-HC-2018-FL, 2017 WL 481426, at *4 (E.D.N.C. Feb. 6, 2017) ............................................................................24

*Finch v. McKoy*, 914 F.3d 292 (4th Cir. 2019)............................2, 11, 13, 20, 21, 50

*Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003)..................................11, 20

*Hayes v. Carver*, 922 F.3d 212 (4th Cir. 2019) ...........................11, 20, 21

*House v. Bell*, 547 U.S. 518 (2006) ...................... 5, 11, 12, 13, 21, 24, 50

*Hyman v. Brown*, 927 F.3d 639 (2d Cir. 2019) ...................................12, 24

*McQuiggin v. Perkins*, 529 U.S. 383 (2013) ........................................2, 10

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .................................................3

*Rose v. Lee*, 252 F.3d 676 (4th Cir. 2001) .............................................3, 13

*Schlup v. Delo*, 513 U.S. 298 (1995) .................................................11, 24

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) .....................................3, 13

*Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988) ..................................18

*Teleguz v. Pearson*, 689 F.3d 322 (4th Cir. 2012)...............................11, 21

*United States v. Agurs*, 427 U.S. 97 (1976).............................................19

*United States v. Wilson,* 135 F.3d 291 (4th Cir. 1998)...............................8

*Whitley v. Blair*, 802 F.2d 1487 (4th Cir. 1986)......................................24

*Wolfe v. Clarke*, 819 F. Supp. 2d 538 (E.D. Va. 2011) ...........................18

## STATUTES AND RULES

28 U.S.C. § 2244 ..................................................................2, 4, 10

28 U.S.C. § 2253(c) ......................................................................1

28 U.S.C. § 2254 ........................................................................1, 3

Federal Rule of Appellate Procedure 22(b) ................................1

Federal Rule of Appellate Procedure 32 ..................................55

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts ..........................................................................................1

Petitioner-Appellant, Lamont McKoy, files this Informal Brief, pursuant to this Court's Informal Preliminary Briefing Order filed April 30, 2020.

## STATEMENT OF JURISDICTION

This is a direct appeal of a final judgment of the United States District Court for the Eastern District of North Carolina, entered on March 30, 2020, dismissing without prejudice Appellant's petition for writ of habeas corpus.  The District Court had jurisdiction under 28 U.S.C. § 2254.  Appellant filed a timely notice of appeal on April 29, 2020.

The District Court denied a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. This Court has jurisdiction to determine whether to grant a certificate of appealability under 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b).

-1-

## STATEMENT OF THE ISSUES

Appellant requests that this Court grant him permission to appeal the following issues, as their resolution is at least debatable among reasonable jurists:

### Issue One

Whether the standard of review applied by the District Court to review the "actual-innocence gateway" under *McQuiggin v. Perkins*, 529 U.S. 383 (2013) and this Court's decision in *Finch v. McKoy*, 914 F.3d 292 (4th Cir. 2019) was erroneous.

### Issue Two

Whether Appellant meets the "actual-innocence gateway" entitling him to relief of the one-year statute of limitation under 28 U.S.C. § 2244(d) and any other procedural barriers to raising the constitutional violations included in his amended petition for a writ of habeas corpus.

**STANDARD OF REVIEW**

Where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability requires "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted)); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017) ("[a]t the COA stage, the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)) (internal quotation marks omitted)).

**INTRODUCTION**

In 1991, Appellant Lamont McKoy was wrongfully convicted and sentenced to life in prison for the fatal shooting of Myron Hailey the year before.[1] McKoy's amended petition for writ of habeas corpus asked for relief under 28 U.S.C. § 2254 on the ground that the State of North Carolina had suppressed exculpatory

---

[1] Dk. 90-9 at 317:2-14. McKoy was sentenced to life in prison. He has since received parole, and is presently under the supervision of the State of North Carolina as a parolee.

evidence pointing to the actual perpetrator and failed to correct the false testimony of the State's principal witness at trial.[2]  The District Court adopted the Magistrate Judge's Report and Recommendation and dismissed McKoy's petition on procedural grounds, finding that McKoy failed to satisfy the actual-innocence gateway and that his constitutional claims were either barred under 28 U.S.C. § 2244 of the Antiterrorism and Effective Death Penalty Act of 1996, the non-exhaustion doctrine, or the independent and adequate state procedural grounds doctrine.[3]  The District Court also denied a certificate of appealability.[4]

The District Court's decision rests on its finding that a reasonable juror could conclude McKoy confessed to the shooting based on an exchange he had with one of the investigating officers.[5]  In that exchange, and as discussed more fully below, McKoy flippantly replied "I know it" to the officer's statements about McKoy's involvement in Hailey's murder.[6]  Ample evidence demonstrates that not even the investigating officer believed McKoy's retorts amounted to a confession, including the officer's later report that McKoy had not made any self-incriminating

---

[2] *See* Dk. 76; *see also* Dk. 90.
[3] Dk. 131 at 12.
[4] Dk. 131 at 12–13.
[5] Dk. 131 at 11.
[6] Dk. 90-8 at Narratives 107–10; Dk. 91-1 at 54-57; *see* Appendix A.

statements.[7]  (A full copy of the police notes on this exchange is attached as

**Appendix A**.)

Based on the District Court's finding regarding the statements, the District

Court then erroneously determined that, because of the "confession," the new

evidence of McKoy's innocence did not preclude a reasonable juror from finding

McKoy guilty – and McKoy therefore failed to meet the innocence gateway.[8]  As

also detailed below, however, the District Court used the incorrect standard in

making that assessment, engaging in a "sufficiency-of-the-evidence test" rather

than the "probabilistic determination" based on the totality of the evidence required

under the innocence gateway.  *See House v. Bell*, 547 U.S. 518, 537–38 (2006).

That error resulted in the erroneous conclusion that McKoy failed to satisfy the

gateway.

_____

On the early morning of January 26, 1990, Myron Hailey was found dead in

his car, crashed down an embankment in a small public park in Fayetteville, North

Carolina.[9]  A few years after McKoy was convicted of the murder, a joint task

force of federal, state, and local law enforcement officers investigating a violent

_____

[7] *Id.*; Dk. 90-11 at 13.

[8] Dk. 131 at 9-12.

[9] *See* Dk. 90-8 at Narrative 5.

drug gang in Fayetteville – the Court Boys – uncovered significant evidence that a member of that gang, not McKoy, killed Hailey.[10]

Hailey was killed by a .357 bullet shot through the back of the Honda Accord he was driving and piercing his body.[11]  After Hailey's body was discovered, the police concluded that he was not murdered at the crash site but had been shot somewhere else and died after fleeing that location.[12]  In just a few hours, Fayetteville Police Department ("FPD") investigators Michael Ballard and Robert Parker focused their investigation on the Haymount Hill area of Fayetteville, where McKoy lived, which is about one mile southwest of where Hailey's body was found.  Nothing in the record explains why Ballard and Parker settled on that area.  Gunshots had been reported there the night before, but those shots were later determined to be unrelated[13] and shots had been reported elsewhere in the city that night.[14]

Then, with little to no credible evidence, Ballard and Parker settled on McKoy as the perpetrator, and the case went to trial with only the uncorroborated testimony of one person, Bobby Lee Williams, implicating McKoy.  Williams was

---

[10]  *See* Section II.C. *infra.*
[11]  *See* Dk. 90-9 at 284:19-286:11.
[12]  *See* Dk. 90-8 at Narrative 2.
[13]  *See* Dk. 90-9 at 193:19–194:4, 196:9–14, 203:6–9, 242:23–243:6, 243:7–10, 249:10–19, 268:16–269:16.
[14]  *See* Dk. 90-2; Dk. 90-3.

addicted to crack at the time[15] and, as detailed below, told a story inconsistent with known facts and otherwise utterly incredible.[16] Williams later recanted his testimony, telling his fiancée and others that he had been paid to testify falsely and complaining that Ballard and Parker had not paid the full promised amount.[17] Williams was later murdered, reportedly for "snitching" in another case.

Not long after McKoy was convicted, the joint task force investigating the Court Boys uncovered evidence that Court Boys member William Talley (aka "Rat-Rat") killed Hailey.[18] Although the task force was not investigating Hailey's murder, multiple witnesses volunteered information regarding the circumstances of Hailey's death.[19] These witnesses told a consistent story, detailing that the shooting occurred just outside the Grove View Terrace public housing complex, where the Court Boys operated and which was about one mile east of where Hailey's body was discovered and two miles from Haymount Hill, where the State alleged the murder occurred in McKoy's trial.[20] Those witnesses described a drug deal gone awry, where Hailey snatched drugs through the car window and sped away, and Talley fired multiple shots at the back of his car.[21] The witnesses

---

[15] Dk. 118 at 90:13-21, 96:8-11; Dk. 117 at 118:24-3-119:4.
[16] *See* Section II.B.1. *infra*.
[17] *See* Dk. 90-6 at ¶¶ 15–20.
[18] *See* Section II.C.1. *infra*.
[19] *Id*.
[20] *Id*.
[21] *Id*.

described the car slowing at one point and weaving out of the neighborhood.[22] Some of the witnesses even described seeing the car the next morning precisely where Hailey's car was found and revealed that they knew McKoy (or someone in Haymount Hill) had been wrongfully convicted of the crime.[23]

In 1995, as a result of the task force investigation, Talley was convicted of federal drug trafficking charges.[24] During his trial, the federal prosecutor introduced evidence of the Hailey shooting (without naming Hailey),[25] and, at Talley's sentencing hearing and on appeal to this Court, the prosecutor argued that Talley alone was responsible for Hailey's death.[26] When a member of this Court asked the prosecutor at oral argument why he would accuse Talley of a murder for which someone else had been convicted in state court, the prosecutor replied, "We believed our witnesses."[27] Since then, more eyewitnesses have come forward implicating Talley in Hailey's murder.[28]

---

[22] *See, e.g.*, Dk. 92-3 at 224:25-225:6; Dk. 92-20.

[23] *See, e.g.*, Dk. 92-2 at 133:24-135:19; Dk. 92-2 at 225:7-15; Dk. 92-18; Dk. 118 at 57:18-58:19.

[24] *See* Dk. 92-1.

[25] *See* Dk. 92-1 at 20 ("[T]he government contends that the evidence at trial indicated that Talley was responsible for a homicide in Grove View Terrace when a cocaine base customer tried to short-change Talley.").

[26] Dk. 92-24 at 9–11.

[27] *United States v. Wilson, 135 F.3d 291, 300 n.6 (4th Cir. 1998).*

[28] *See* Section II.C.I. *infra*.

New evidence at the core of the habeas petition considered by the District Court further demonstrates that the federal prosecutor had it right, *i.e.*, his witnesses were believable – and that Hailey was shot in Grove View Terrace not Haymount Hill. That new evidence includes police records showing that, because of the unrelated, earlier shooting in Haymount Hill, which shot out a transformer and cast the neighborhood into darkness, the FPD's emergency response team was dispatched to protect the utility company as it repaired the transformer, to investigate the earlier shooting, and to quell any continuing violence.[29] That team "saturated" the area, staying on site during the time and at the precise location Williams falsely claimed he witnessed McKoy shoot Hailey.[30]

The new evidence also includes two tips the FPD received within 72 hours of Hailey's murder that implicate Talley in the murder.[31] These tips were never pursued by Ballard or Parker and were never disclosed to the defense at trial or for many years afterward, even though McKoy and his counsel have long argued Talley's responsibility for the murder and the State countered that the FPD's investigation produced no evidence implicating him. The defense never learned of the tips until 2018, twenty-seven years after McKoy was convicted, when the

---

[29] *See* Dk. 119 at 8:8–10:17.

[30] *See* Dk. 119 at 7:20–23, 8:8–10:17.

[31] Dk. 90-2–3.

-9-

Assistant Attorney General defending the habeas petition produced the full FPD
file in response to the District Court's discovery order.[32]

_____

In light of the significant evidence of McKoy's innocence described more
fully below, the requirements for a certificate of appealability are fully met as is
the innocence gateway to reach McKoy's constitutional claims.  As described
below, reasonable jurists would at least find it debatable whether (1) McKoy's
petition states a valid claim of the denial of a constitutional right, and (2) the
District Court erred in its procedural ruling.  Further, had the District Court made a
probabilistic determination of the totality of the evidence, rather than incorrectly
applying a sufficiency test, it would have had to find that no reasonable juror could
have convicted McKoy.

## LEGAL STANDARDS

Innocence Gateway.  Where a petition for writ of habeas corpus is
procedurally-defaulted under 28 U.S.C. § 2244 of the Antiterrorism and Effective
Death Penalty Act of 1996, the non-exhaustion doctrine, or the independent and
adequate state procedural grounds doctrine, a petitioner may still seek a Writ of
Habeas Corpus by passing through the "actual-innocence gateway."  *McQuiggin v.
Perkins*, 569 U.S. 383, 386 (2013) ("[w]e hold that actual innocence, if proved,

_____

[32]  Dk. 49 at 3.

serves as a gateway through which a petitioner may pass whether the impediment

is a procedural bar . . . or, as in this case, expiration of the statute of limitations");

*see also Schlup v. Delo*, 513 U.S. 298, 327–29 (1995). A petitioner may pass

through the "actual-innocence gateway" if he or she presents new evidence and

"demonstrate[s] that the totality of the evidence would prevent any reasonable

juror from finding him guilty beyond a reasonable doubt." *Finch v. McKoy*, 914

F.3d 292, 298 (4th Cir. 2019) (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th

Cir. 2012)). "An actual innocence finding 'requires a holistic judgment about all

the evidence and its likely effect on reasonable jurors applying the reasonable-

doubt standard.'" *Finch*, 914 F.3d at 299 (concluding that petitioner satisfied the

actual innocence standard) (quoting *House*, 547 U.S. at 539).

The requirement for "new" evidence is met if a petitioner cites exculpatory

evidence that was not presented at trial. *Hayes v. Carver*, 922 F.3d 212, 217 (4th

Cir. 2019); *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003); *see also Finch*,

914 F.3d at 299 (finding that petitioner's evidence that the line-ups in which he

was identified were impermissibly suggestive was new evidence for purposes of

determining actual innocence). Once the petitioner has presented new evidence,

> the court must consider all the evidence, old and new, incriminating and
> exculpatory, without regard to whether it would necessarily be admitted
> under rules of admissibility that would govern at trial. Based on this
> total record, the court must make a probabilistic determination about
> what reasonable, properly instructed jurors would do. The court's
> function is not to make an independent factual determination about

-11-

what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

*House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks and citations omitted).

As a result, "the gateway actual-innocence standard is by no means equivalent to the standard . . . which governs claims of insufficient evidence." *Id.* (internal quotation marks omitted). Unlike the sufficiency-of-the-evidence standard, which "asks whether the trial evidence, viewed in the light most favorable to the prosecution, 'could' allow any reasonable trier of fact to find a charged crime proved beyond a reasonable doubt," the "actual innocence standard considers a different 'mix of evidence' from a different 'vantage point.'" *Hyman v. Brown*, 927 F.3d 639, 658 (2d Cir. 2019). Although a petitioner may pass through the actual-innocence gateway in an extraordinary case, a finding of actual innocence "does not require absolute certainty about the petitioner's guilt or innocence." *House*, 547 U.S. at 538.

Certificate of Appealability. As stated above, where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability requires "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its

-12-

procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted)).

## ARGUMENT

### I.     Reasonable Jurists Would Debate Whether The District Court Was Correct in its Procedural Ruling.

McKoy meets the requirements for a certificate of appealability.  While the constitutional claim was not considered by the District Court, it is not only debatable but is undeniable that McKoy was denied his constitutional rights by the evidence suppressed here.  Moreover, given the significant evidence of McKoy's innocence and Talley's guilt, reasonable jurists would find it debatable whether the District Court erred in its ruling on the "actual-innocence gateway."  More specifically, under *House* and *Finch*, reasonable jurists would debate whether the District Court applied the correct test in evaluating McKoy's "actual innocence" claim and, as described in Part II below, would find likely conclude that McKoy has met the "actual innocence" standard.

#### A. Reasonable Jurists Would at Least Find it Debatable Whether McKoy's Petition States a Valid Claim of the Denial of a Constitutional Right

##### 1.  Talley Tips Were Suppressed.

On January 27, 1990, the day after Hailey's body was found, the Fayetteville Police Department ("FPD") received an anonymous tip that Talley was the

shooter.[33]  The next day, a second tip from a different caller also identified Talley as the shooter.[34]  These tips were not disclosed to the defense.[35]  Indeed, they were not discovered until March 2018, when, in response to a discovery order, the assistant attorney general defending against this habeas action produced the full FPD file.[36]

Although the police received these two tips at the outset of the investigation, they did not pursue either of them,[37] even though a note on one of the tips says to "check into the matter and respond within ten (10) days."[38]  The failure to pursue the tips is inconsistent with the fact that just hours before the first tip, Ballard and Parker checked with the front desk and other officers at the police station to see if there were any new tips.[39]  During the federal court evidentiary hearing, Ballard admitted being given the tips and that they were leads.[40]

The police initially considered Dennis Fort as the shooter, but, by February 1, 1990, had rejected him as a suspect and asked for his cooperation in identifying other suspects.[41]  Bobby Williams did not directly implicate McKoy until

---

[33] Dk. 90-2.
[34] Dk. 90-3.
[35] Dk. 93-4 .
[36] Dk. 49-12.
[37] Dk. 117 at 76:9-17, 78:3-79:4.
[38] Dk. 90-2 at 1.
[39] Dk. 90-8 at Narrative 20.
[40] Dk. 117 at 115:19-20.
[41] Dk. 90-8 at Narrative 33.

February 20, 1990.[42]  Even during these weeks in which the police had no clear

suspect, they still did not pursue the two tips that Talley shot and killed Hailey.[43]

At the federal court evidentiary hearing, in an effort to explain why he did not

pursue the tips, Ballard testified that he did not pursue them because "the name

Rat-Rat [a.k.a Talley] is not one that came up in the Bryan and Branson Street

area," and he would not pursue an uncorroborated tip.[44]

Ballard's testimony ignores the fact that Talley's name would not come up

in the Bryan and Branson Street area because the shooting occurred two miles

away in Grove View Terrace.  By not investigating the possibility of a shooting in

Grove View Terrace by going there and talking to people, the police unreasonably

rejected these tips from the start.  Ballard's testimony also overlooks the fact that

there were two tips from different callers,[45] with each tip corroborating the other.

Ballard's explanation is also inconsistent with his early interest in McKoy,

which was based on secondhand information that was not only uncorroborated but

contradicted by the source of the initial information as well as the known facts.[46]

---

[42]  Dk. 90-8 at Narratives at 57-61.

[43]  Dk. 117 at 115:7-118:20.

[44]  Dk. 117 at 76:9-17, 115:7-116:18.

[45]  *Compare* Dk. 90-2 at 2 (referring to a female caller) *with* Dk. 90-3 (referring to a male caller).

[46]  *Compare* Dk. 90-8 at Narrative 137 (interviewee acknowledging "he did not hear a lot" but stating he heard a rumor while at the McNeil house that McKoy was the shooter) *with id.* at Narrative 50 ("Ms. McNeil denied any such information coming from this residence.").

By contrast, the two tips implicating Talley were received from two different callers, and one of them named an eyewitness.[47] Ballard's explanation for why he dismissed the tips and instead focused on McKoy is unsupported by the facts of the crime and the investigative criteria that he actually used.

Although the tips were disregarded at the time of the FPD investigation into Hailey's murder,[48] the FPD must have recognized their significance later on. For example, when the full FPD file was made available to McKoy's current counsel, the tips were still not in the file.[49] Also, while the lengthy FPD running investigative report discusses other tips, these first two tips are not mentioned. Indeed, after his trial in 1995, McKoy specifically inquired to the police about Talley.[50] In response to McKoy's request, the police examined the record but did not find any reference to Talley's name or his alias, Rat-Rat.[51] The police further stated that "at no other time did the investigation head in a direction towards a William Talley a.k.a.: Rat-Rat."[52] When McKoy filed post-trial motions for

---

[47] *Compare* Dk. 90-2 at 2, 4  (referring to a female caller who said "Irvin Cook saw the shooting") *with* Dk. 90-3 (referring to a male caller).
[48] Dk. 117 at 76:9-17.
[49] Dk. 93-4; *see also* Dk. 49-9 at 4-6.
[50] Dk. 93-2.
[51] *Compare* Dk. 93-2 (McKoy asking the police about references to Talley in the police files) *with* Dk. 93-3 (Sergeant Flannery stating that he was "unable to locate any of the names Lamont McKoy mentioned").
[52] Dk. 93-3.

-16-

appropriate relief, the State consistently argued that there was no evidence linking Talley to McKoy's case.[53]  The State never mentioned either of the Talley tips.

The Talley tips are *Brady* evidence and their suppression violated McKoy's right to Due Process under the Fourteenth Amendment.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Both tips constitute leads, identifying Talley as Hailey's shooter and providing the same location for the shooting, Grove View Terrace. These tips are favorable evidence under *Brady*.  This is true even if the disclosure of the two tips had not turned up additional exculpatory evidence:  "There is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the [State] fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material."  *Dennis v. Sec. of Pa.*, 834 F.3d 263, 306 (3d. Cir. 2016). However, here, as described below, disclosure of the tips would have turned up several witnesses who could have testified to Talley's, not McKoy's, responsibility for Hailey's death.

### 2. FPD's Presence at Bryan and Branson was Suppressed Allowing False Testimony from the State's Principal Witness.

The State allowed its principal witness at trial, Bobby Williams, to provide an account that was impossible based on the information that was known to the State.  Williams testified that he entered an arcade with Hailey while looking for

---

[53]  *See*, *e.g.*, Dk. 93-13.

McKoy shortly before Hailey was shot.[54]  The State knew the arcade closed at

about 9:30 p.m., yet it allowed Williams to describe a shooting that, based on the

State's records, could not have happened earlier than about 1:00 a.m., much less

3:30 a.m. as the State now argues.[55]  The Investigating Officer Michael Ballard

had actual knowledge of the time the arcade closed and the police presence at

Bryan and Branson Street.  Instead of correcting the testimony of Williams,

however, Ballard repeated it.[56]  This is not appropriate.  *Wolfe v. Clarke*, 819 F.

Supp. 2d 538, 546 (E.D. Va. 2011), *aff'd*, 691 F.3d 410 (4th Cir. 2012), *and order

enforced*, No. 2:05CV432, 2012 WL 13103658 (E.D. Va. Dec. 26, 2012), *vacated

and remanded*, 718 F.3d 277 (4th Cir. 2013) (citing *Stockton v. Virginia*, 852 F.2d

740, 749 (4th Cir. 1988)).

The District Court suggested that the State had no obligation to correct the

testimony of Williams because "the State never put that specific timeline [that the

shooting occurred between 11:00 p.m. and 12:00 a.m.] before the jury."  (Opinion

at 10.)  This does not account for the fact that Williams stated that he had entered

the arcade shortly before the shooting and that the arcade closed by "about

9:30 p.m."[57]  This account created a timeline of events that could not be true based

---

[54]  Dk. 90-9 at 50:19–24; Dk. 90-11 at 3.
[55]  *See* Section II.1.
[56]  90-9 at 132:1-17.
[57]  Dk. 90-8 at Narrative 16.

on the police presence.  Like Ballard, the District Court suggested that the shots

that were heard at 3:30 a.m. could have been the shots Williams said he witnessed.

This would require Williams and Hailey to have entered an arcade that had closed

six hours prior, however, which no reasonable juror would credit.  It also

contradicts the statements of Johnson and Charles Williams, upon which the

District Court later relies to bolster Bobby Williams's scattered account.[58]

Additionally, there is no record of the FPD incident card being made

available to McKoy and there is no dispute that the police reports regarding the

activities of the FPD's emergency response team were never produced to McKoy.

The State argues that there was no requirement to make this information available

to McKoy because his wife knew that police were in the area at 9:30 p.m.

Knowledge about police presence at 9:30 p.m. is not the same thing as knowledge

that police remained in the area until about 1:00 a.m.  In view of the police

presence on Bryan and Branson Street, a reasonable jurist could, at the very least,

debate whether McKoy's amended petition states a valid claim of the denial of a

constitutional right. And, in a weak case like the one here, a reasonable jurist

would be compelled to find a material violation of McKoy's constitutional rights.

*See United States v. Agurs*, 427 U.S. 97, 112–13 (1976) (noting that, "if the verdict

is already of questionable validity, additional evidence of relatively minor

---

[58]  Dk. 131 at 10.

importance might be sufficient to create a reasonable doubt," rendering the suppressed evidence material).

### B. Reasonable Jurists Would at Least Find it Debatable Whether the District Court Erred in its Procedural Ruling

#### 1. McKoy Presented New Evidence.

In his amended petition, McKoy raised new evidence that was not presented at trial. *See Hayes v. Carver*, 922 F.3d 212, 217 (4th Cir. 2019); *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003); *see also Finch v. McKoy*, 914 F.3d 292, 299 (4th Cir. 2019). This includes evidence that the police understood that McKoy made no incriminating remarks in his interviews, [59] evidence that Williams provided false testimony, [60] evidence that Parker redirected investigations, [61] evidence that the police were present at Bryan and Branson Street on the night that Hailey was shot, [62] and evidence that Talley shot and killed Hailey.[63]

The District Court did not make a determination as to whether McKoy raised evidence that had not been presented at trial. When it addressed the two Talley tips, the District Court stated that "the record reflects that petitioner had heard such

---

[59] *See* Dk. 90-8 at Narrative 110-11; Dk. 90-11 at 13; Dk. 91-1 at 36.
[60] *See* Section II.B.
[61] *See* Section II.B.2.
[62] *See* Section II.B.3.
[63] *See* Section on II.C.

rumors that Talley shot and killed Hailey prior to trial, and informed his counsel of such rumors."[64]

As stated above, the information in these tips was not previously known to McKoy. Further, there is no dispute that this or the other new evidence raised by McKoy was not presented at trial. Therefore, they are new under *Hayes* for the purpose of evaluating a claim of actual innocence.

### 2. The District Court Applied a "Sufficiency-of-the-Evidence" Test to the New Evidence, Rather than the Required Holistic Review.

When the totality of the evidence, old and new, incriminating and exculpatory is considered holistically, no reasonable juror could find McKoy guilty of shooting Hailey beyond a reasonable doubt. *See House v. Bell*, 547 U.S. 518, 537–38 (2006); *Finch*, 914 F.3d at 299 ("[Petitioner] must also demonstrate that it is more likely than not that 'the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt.'") (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)). The District Court, however, did not undertake this required holistic review. Instead, it adopted the Magistrate Judge's opinion that concluded that McKoy made an admission of guilt, and that "without compelling reason to disregard the [purported admission], such as a claim of coercion, a credible recantation, or another person taking

---

[64] Dk. 131 at 11.

responsibility for the murder, an admission of guilt precludes McKoy from establishing his actual innocence."[65]  For the reasons described at length in Section II.A. below, the evidence shows that McKoy never confessed.  It is also erroneous to compare each item of evidence to the purported confession as the Magistrate's Recommendation does, and the District Court's Order similarly applies the wrong "sufficiency-of-the-evidence" test without the required holistic assessment.

For example, the District Court evaluated whether "a reasonable juror could disregard the portions of Williams's testimony that are contradicted or unsupported" without making a probabilistic comparison with the Talley evidence.[66]  This is not appropriate because a reasonable juror would naturally compare the "contradicted" and "unsupported" portions of Williams's testimony with the voluminous and consistent evidence related to the Talley shooting.[67]  Indeed, the only evidence that the District Court directly compared to Williams's testimony was McKoy's statements to Ballard.[68]  In looking to only this evidence and not the totality of the evidence, the District Court erred as a matter of law.

The Magistrate Judge's Report and Recommendation, which was adopted by the District Court, similarly applies a sufficiency-of-the-evidence test.  For

---

[65]  Dk. 127 at 53–54.
[66]  *See* Dk. 131 at 9.
[67]  *Id.*
[68]  *Id.*

example, the Magistrate Judge began his analysis by evaluating whether McKoy's "I know its" could be interpreted as a confession (even while recognizing there were other reasonable interpretations).[69]  After making a final conclusion about the purported confession, the Magistrate Judge then assessed each piece of exculpatory evidence individually against this "confession."[70]  For example, after detailing some of the inconsistencies in Williams's testimony, the Magistrate Judge concluded that these inconsistencies "do not affect the persuasive weight of McKoy's statements." [71]  After discussing the police presence at Bryan and Branson Street, the Magistrate Judge concluded that "there was nothing in the record that would have required a reasonable juror to reject McKoy's statements."[72]  After describing some of the Talley evidence, the Magistrate Judge concluded that they do not "nullify the effect of McKoy's statements to Ballard."[73]  After describing the evidence of Parker's history of bribes, the Magistrate Judge concluded that "[a] reasonable juror would not need to disregard or discount McKoy's statements on this basis."[74]

---

[69] *See* Dk. 127 at 53–54.

[70] *See* Dk. 127 at 54–58.

[71] *E.g.*, *compare* Dk. 127 at 35–40 *with id.* at 54.

[72] *See* Dk. 127 at 55–56.

[73] Dk. 127 at 58.

[74] Dk. 127 at 58.

This does not follow *Schlup*.[75]  *See House*, 547 U.S. at 537–38; *Hyman*, 927 F.3d at 658.  Instead of evaluating McKoy's statements in a silo and then comparing it one-by-one to other evidence, the Magistrate Judge should have considered all of the evidence together and then made a probabilistic determination of whether any reasonable juror could find McKoy guilty beyond a reasonable doubt based on the entirety of the record.  Such a determination would evaluate, for example, how a reasonable juror would have interpreted McKoy's statements in light of the Talley evidence that indicated that another person shot and killed Hailey. *See House*, 547 U.S. at 553–54 (finding that petitioner satisfied the actual innocence standard where although "[s]ome aspects of the State's evidence . . . still support an inference of guilt[,] the central forensic proof connecting [petitioner] to the crime . . . has been called into question, and [petitioner] has put forward substantial evidence pointing to a different suspect").

The Magistrate Judge did not do this.  This conclusion was then adopted by the District Court, which stated that "[t]he magistrate judge concluded that petitioner offered no compelling reason for a jury to disregard his March 1990

---

[75]  The Magistrate Judge cited *Figgs v. North Carolina*, No. 5:16-HC-2018-FL, 2017 WL 481426, at *4 (E.D.N.C. Feb. 6, 2017) and *Whitley v. Blair*, 802 F.2d 1487, 1504 (4th Cir. 1986).  Neither of these cases is relevant.  In *Figgs* and *Blair*, there was no newly presented exculpatory evidence that was reliable.  *Figgs*, 2017 WL 481426 at *4; *Blair*, 802 F.2d at 1504.  This is not the case here.

-24-

statements."[76] When the appropriate holistic framework is used, however, it is evident that it is incorrect to interpret McKoy's retorts as an admission and, more generally. No reasonable juror would have reasonable doubt regarding McKoy's guilt.

## II.    The Totality of the Evidence Demonstrates McKoy's Actual Innocence.

### A.    There Was No Confession.

In March 1990, six weeks after Hailey's murder, the police stopped McKoy who was driving an uninsured vehicle.[77] According to Investigating Officer Michael Ballard's notes, he arrived at the scene following the traffic stop and asked McKoy to get out of his car and come to his unmarked police car.[78]

After entering Ballard's car, McKoy asked Ballard what he wanted to discuss. When Ballard replied "murder," McKoy said "I ain't saying shit" and started to exit the car.[79] McKoy stopped when Ballard told him that he could not return to his vehicle, which was uninsured.[80] Ballard then told McKoy that his name had come up in the investigation into Hailey's death.[81] McKoy denied his involvement.[82] According to his notes, Ballard then made a series of statements

---

[76]  Dk. 131 at 9.
[77]  Dk. 91-1 at 54-57; *see* Appendix A.
[78]  *Id.*
[79]  *Id.*
[80]  *Id.*
[81]  *Id.*
[82]  *Id.*

about Hailey's murder and a separate shooting.[83]  McKoy replied "I know it" to each of Ballard's statements,[84]  which McKoy later explained was slang, similar to "yeah, sure" or "whatever you say."[85]

McKoy's repeated "I know its" the series of questions put to him do not constitute a confession.  The police understood as much, letting him walk away at the end of the exchange.[86]  Four days after his exchange with McKoy, Ballard told Hailey's family that there was "minimal" evidence in the case.[87]  A month later, Ballard wrote in the Hailey murder's Felony Investigative Report that was submitted to the District Attorney's Office that McKoy was the only defendant to not make incriminating remarks in his interviews (16-year old Charmaine Evans made incriminating remarks but admitted the following day that he provided a false statement during an intense interrogation).[88]

The District Court's interpretation of McKoy's "I know its" would also require reading other statements between McKoy and Ballard in a manner that no

---

[83] *Id*.

[84] *Id*.

[85] Dk. 128 at 8–9 (citing Urban Dictionary Definition of "you know it"), *available at* https://www.urbandictionary.com/define.php?term=You%20know%20it (last visited Feb. 14, 2020) ("To totally disregard what someone is saying or said, and just agree with them completely whether or not they're right.").

[86]  *Id.*

[87]  Dk. 90-8 at Narrative 111.

[88]  Dk. 90-11 at 13; Dk. 91-1 at 36 (Ballard told Hailey's mother that the evidence consisted of "an eyewitness and two subjects who we were going to try to Rollover [sic] on McKoy.).

reasonable juror could credit. For example, no reasonable juror would believe that McKoy said "I ain't saying anything" immediately after confessing to a murder.[89] Nor would a reasonable juror believe that Ballard would respond to a confession not by arresting McKoy, but by requesting a polygraph so that he could "eliminate" McKoy as a suspect.[90] Similarly, it is impossible to understand McKoy's "I know its" as a confession when Ballard redoubled his request for a polygraph by telling McKoy that an "innocent man" would want the opportunity to take a polygraph so he could "prove that he is telling the truth."[91] Ballard's statement acknowledges that McKoy was holding fast to his innocence and that Ballard challenged him to prove it by taking a polygraph. A full copy of the original police notes regarding this exchange is attached as **Appendix A**.

Finally, some of Ballard's statements to which McKoy replied "I know it" contradicted Williams's testimony at McKoy's trial. For example, when Ballard told McKoy that he shot Hailey "because he ripped you off," McKoy said "I know it."[92] Williams, however, made it a central detail of his testimony that Hailey paid McKoy in full for the drugs.[93] Thus, what the State claims and the District Court

---

[89] *See* Dk. 90-9 at 144:15–16.
[90] Dk. 91-1 at 54-57; *see* Appendix A.
[91] *Id*.
[92] *Id*.
[93] *See* Dk. 90-9 at 52:7–53:25.

found to be a "confession" contradicts the story told by Williams at trial, the principal evidence on which McKoy's conviction was obtained.

In sum, no reasonable juror would find a confession in light of Ballard's notes as well as Ballard's original understanding that no confession had been made, especially when the alleged confession would have contradicted Williams, the State's principal witness against McKoy.[94]

## B.    The State Relied on False Evidence.

The evidence relied upon by the District Court to bolster the so-called confession by McKoy was obtained from an incentivized witness and, given what is now known, would not be credited by any reasonable juror.  The purported eyewitness the State called at McKoy's trial, Williams, testified inconsistently about the details of the claimed confession and other uncontested facts, and that witness twice admitted he testified falsely in exchange for cash from the police. The State offered no physical evidence against McKoy, and it presented no other testimony from any other witnesses who could directly implicate McKoy in Hailey's death.

---

[94]  The alleged confession amounts to a last ditch effort to preserve a conviction when the testimony of the State's purported eyewitness – and only direct evidence against McKoy – has been proven beyond any doubt to be full of falsehoods rendering it incredible. The objective evidence from the State's original investigation makes plain it never believed McKoy confessed despite Ballard's self-serving testimony nearly 30 years after McKoy was first convicted.

### 1. The Falseness of Williams's Testimony is Reflected in His Erroneous and Inconsistent Account.

Williams testified that he assisted Hailey in returning fake crack cocaine to McKoy in exchange for real crack cocaine and saw McKoy shoot Hailey afterwards.[95]  The timeline that Williams provided for this account, however, would either place the shooting at the exact time and location where police were stationed or create an impossible chronology of events.  As a result, no reasonable juror would credit Williams's testimony.

Williams testified that he returned from his parole-required community service, took a shower, and then went on a walk.[96]  During this walk, he came across Myron Hailey, whom he had not seen since they were incarcerated together years before.[97]  According to Williams's story, Hailey received fake crack cocaine from a dealer in the area, and Williams tested the cocaine and confirmed it was fake.[98]

Williams testified that he and Hailey then walked to a nearby arcade to look for the dealer.[99]  They walked inside the arcade and noticed a couple of people playing machines and shooting pool, but did not see the dealer.[100]  They then

---

[95] Dk. 90-9 at 52:13–53:25.
[96] Dk. 90-9 at 48:9–15.
[97] Dk. 90-9 at 48:15–16.
[98] Dk. 90-9 at 50:6–17.
[99] Dk. 90-9 at 50:19–24.
[100] Dk. 90-9 at 50:22–24.

walked out of the arcade and back to the intersection of Bryan and Branson Streets, where they had started.[101]  Williams testified that when they made it to this intersection, Hailey spotted McKoy and pointed him out as the dealer.[102]

Williams testified that he then oversaw an exchange in which McKoy gave Hailey real cocaine in exchange for the fake crack cocaine that Hailey had paid for earlier.[103]  Williams further testified that he and Hailey tested the cocaine to confirm that it was real, and then walked away, leaving the men and drugs behind.[104]  Williams claimed to have heard a shot about five minutes later and returned to the intersection of Bryan and Branson Streets, where he saw McKoy and two other men running along a path that started near the corner of Bryan and Branson.[105]  Feeling "nosey," Williams testified that he followed them to the end of the path, where he saw McKoy shoot at Hailey's car a second time as Hailey drove away.[106]

Many of the core events in Williams's account occurred at the exact place where police were stationed – at the corner of Bryan and Branson Streets – because of an earlier shooting in the area that night.[107]  A transformer had been shot out,

---

[101]  Dk. 90-9 at 50:25.
[102]  Dk. 90-9 at 50:25–51:1.
[103]  Dk. 90-9 at 52:13–53:24.
[104]  Dk. 90-9 at 53:2–24.
[105]  Dk. 90-9 at 60:7–20, 89:1–25.
[106]  Dk. 90-9 at 55:2–56:8, 92:1–5.
[107]  *See* Dk. 90-9 at 220:6–9, 231:12–15, 243:7–11, 269:12–13; Dk. 117 at 95:3–18.

and the FPD's emergency response team was dispatched to investigate that shooting, quell any further violence, and oversee the transformer's repair and restoration of power to the neighborhood.[108]

According to Williams's story, this corner is where Hailey carried 13-14 zip-lock bags of crack cocaine in his hand, where Williams laid the cocaine out on the trunk of Hailey's car, where Williams tested the cocaine to see if it was fake, where McKoy gave Hailey real cocaine in exchange for the fake, where Williams and Hailey tested the cocaine to see if it was real, and where McKoy fired the first shot at Hailey's car.[109]

In addition to occurring at the same place the police were stationed, these events were said to have occurred at the same time that they were present, between 9:43 p.m. and 1:00 a.m.[110]  In the Felony Investigative Report, Ballard stated that the shooting occurred "between the hours of 2300 & 2400."[111]  Williams testified that he saw Hailey after the power had been restored in the neighborhood, which happened at about 11:15 – 11:30 p.m.[112] As described above, however, Williams also testified that he and Hailey entered the arcade,[113] which had closed at "about

---

[108] *See* Dk. 119 at 8:8–10:17.

[109] Dk. 90-9 at 49:1–54:18.

[110] Dk. 91-10.

[111] Dk. 90-11 at 3.

[112] Dk. 90-9 266:9–11, 269:7–16.

[113] Dk. 90-9 at 50:19–24.

-31-

9:30 p.m."[114]  In other words, Williams testified that he and Hailey entered the arcade about two hours after it had closed, which makes Williams's timeline impossible.

This was not a small discrepancy in time that a reasonable juror might be able to overlook..  Williams made the arcade a central part of his story, mentioning it more than 30 times during McKoy's trial.  Yet, given that the arcade closed at 9:30 p.m. that night, a fact Ballard knew from the beginning of the investigation, Williams and Hailey could not have entered it after the lights were restored, about two hours later.  The State now argues that the shooting Williams described occurred at 3:30 a.m.,[115] which would mean that Williams and Hailey entered the arcade more than six hours after it closed.  The arcade was closed under the State's theories, including Williams's testimony at trial and in response to McKoy's petition for a Writ of Habeas Corpus.

Sergeant Tracy Campbell, one of the police officers that was stationed at Bryan and Branson Streets on the night of Hailey's murder, testified at the federal court evidentiary hearing that the emergency response team of the FPD had been dispatched to that very corner in response to the earlier shooting that knocked out the transformer.[116] According to an FPD incident card, this FPD team patrolled the

---

[114] Dk. 90-8 at Narrative 16.
[115] Dk. 20-18 at 8.
[116] Dk. 119 at 8:8–10:17.

area until at least 12:41 a.m.[117]  After that, they remained in the area through the

end of their shift, which usually lasted through 1:00 a.m. but may have extended

longer if they were busy.[118]

Campbell further testified that the emergency response team "would just

saturate an area," with at least 10 police officers working in pairs in unmarked

police cars.[119]  Campbell further testified that, while monitoring an area, he kept

his window down to listen to what people were saying.[120]  If people were working

drugs on the corner of Bryan and Branson Streets, or if cars were passing through

the area, he was confident that he would have seen them and "absolutely" would

have stopped them.[121]  He further testified that he heard no shots fired during that

night and, if shots had been fired, he believed that he would have heard them.[122]

When he later heard that the investigative team placed Hailey's shooting at the

corner of Bryan and Branson Streets, Campbell was dumbfounded, explaining "we

were like where in the world did it happen?"[123]

---

[117] Dk. 91-10.
[118] Dk. 119 at 7:22-8:14.
[119] Dk. 119 at 7:20–23.
[120] Dk. 119 at 9:12–10:1.
[121] Dk. 119 at 18:8-24; *see also* Dk. 117 at 97:23-98:3 (Officer Ballard testified that "[i]f the police were sitting at that intersection, I'm sure there wasn't no shooting").
[122] Dk. 119 at 21:22-22:3, 22:24-23:1.
[123] Dk. 119 at 8:13-9:9.

In addition to this impossible timeline of events, Williams's account included other erroneous and factually inconsistent statements, including the following:

- Williams said that McKoy used a .357 caliber handgun (consistent with the forensics report) but when he was shown a .357 and 9 mm handgun and asked which type of gun McKoy purportedly used, he pointed to the 9 mm gun (not consistent with the forensics report).[124]

- Williams originally told the police that his fiancée, McCrowie, was with him when he followed McKoy after the first shots were fired.[125] After McCrowie denied this and Ballard informed Williams,[126] Williams amended his statement and testified at trial that he followed McKoy by himself and placed McCrowie in the story only to help Ballard understand what he was saying.[127]

- Williams stated that he was "positive" that a woman by the name of Linda Kemp was in the car with Hailey at the time Hailey was shot.[128] He later said Linda Kemp was not the woman with Hailey.[129]

- Williams originally stated that he saw Hailey leaning against his car at the intersection of Bryan and Branson Streets.[130] At trial, he stated that when he first saw Hailey, Hailey was walking along Branson Street, about a half block away from the intersection.[131]

---

[124] Dk. 90-9 at 255:17-256:3.
[125] Dk. 90-13 at 3.
[126] Dk. 91-2.
[127] Dk. 90-9 at 86:5-11; *see also* Dk. 91-3.
[128] Dk. 90-9 at 151:5-7; Dk. 90-8 at Narrative 73.
[129] Dk. 90-9 at 151:5-7.
[130] Dk. 90-11 at 3; Dk. 90-13 at 1.
[131] Dk. 90-9 at 45:21-46:6.

- Williams originally stated that he saw Hailey's parked car when he first saw Hailey.[132]  He later testified that he only saw the car after he and Hailey made the exchange with McKoy.[133]

- Williams originally stated that he did not know which way Hailey's car went after he purportedly saw McKoy fire the fatal shots.[134]  At trial, however, he said that he watched Hailey make the turn.[135]

- Williams testified that Hailey was wearing a grey, polyester, short-sleeved shirt,[136] but Hailey was actually wearing a long-sleeve white sweatshirt.[137]

- Williams testified that the night of the murder was clear and "milk warm,"[138] but there was heavy rain.[139]

- Williams's account would have required him to run about 780 feet of unimproved path (interrupted by tree roots and fences) faster than it would have taken Hailey to drive about 870 feet of paved road.[140]  Based on Williams's testimony, Hailey also would have had a 5-minutes head start because Williams said he walked back to Bryan and Branson Streets after hearing the first shot.[141]  By the time Williams would have made it back to the intersection, Hailey's car would have already disappeared from view.[142]  The speed at which Williams would have had to run to have made it to the next intersection would have been impossible for any human.[143]

---

[132] Dk. 90-11 at 3; Dk. 90-13 at 1.

[133] Dk. 90-9 at 79:19-80:10, 110:24-111:8.[134] Dk. 90-13 at 4.

[134] Dk. 90-13 at 4.

[135] *E.g.*, Dk. 90-9 at 52:24-53:1, 53:21-24, 59:23-60:2, 93:23-25, 95:4-6 (Williams testimony).

[136] Dk. 119 at 8:13-9:9.

[137] Dk. 90-9 at 188:17-22; *see also* Dk. 90-8 at Narrative 14.

[138] Dk. 90-9 at 96:16-26.

[139] Dk. 90-9 at 189:9-16, 190:6-7; *see also* Dk. 90-8 at Narrative 11.

[140] Dk. 2 at 10-11 (citing Dk. 2-15).

[141] Dk. 90-9 at 86:12-21.

[142] Dk. 90-9 at 57:4-20, 87:10-14.

[143] *See* Note149; Dk. 119 at 26:3-13, 29:10-15.

### 2. Williams Gave False Testimony in Exchange for a Payment from the Police

After McKoy's trial, Williams told his fiancée, Willie Mae McCrowie, that he had provided false testimony against McKoy in exchange for $1,000 from the police.[144]  Before his own murder in 2000, Williams told McCrowie that he intended to come forward about his false testimony.[145]  Williams also told other family members that his testimony was false.[146]  Williams also stated that the police had promised a $1,000 cash bribe to the private investigator hired by McKoy's trial attorney.[147]

The cash-for-testimony offer is consistent with the behaviors of both Parker and Williams.  Parker had a history of police misconduct that is directly linked to protecting the Court Boys gang that, as discussed below, evidence demonstrates killed Hailey.  When Parker transferred to the FPD, he began a years-long assignment as an undercover detective embedded in Grove View Terrace,[148] the housing complex out of which the Court Boys gang operated.[149]  As discussed in Section II.C., eight different witnesses have stated that Talley, known as the Court

---

[144]  Dk. 90-6 at ¶¶ 15, 20.
[145]  Dk. 90-6 at ¶¶ 3, 16-19.
[146]  Dk. 90-6 at ¶¶ 17-19.
[147]  Dk. 90-9 at 250:15-24, 255:12-16.
[148]  Dk. 90-4 at 40:11-41:1.
[149]  Dk. 2-21 at 1.

Boys enforcer, was responsible for Hailey's death. At the federal court evidentiary hearing, Cathy Howard, who lived next to Grove View Terrace and who had a contemporaneous, extramarital affair with Parker, testified that Parker told her to warn the Court Boys when a bust was coming and that Parker was being investigated by the FPD around the time of Hailey's murder.[150]

In 1995, just four years after McKoy's conviction and at about the same time as the joint task force investigation of the Court Boys was concluding, Parker was charged with taking a $500 cash bribe to make cases and evidence against three drug dealers "go away."[151] During Parker's sentencing hearing, a prosecutor testified that Parker was involved in an operation that caught three drug dealers attempting to purchase $40,000 of cocaine and that, following their arrests, the prosecutor learned that the drug dealers were paying Parker "to get [her] to dismiss the cases or to destroy evidence." The attorney for one of the drug dealers notified the police, and the North Carolina State Bureau of Investigation intervened. The SBI provided the drug dealer with $500 in cash, recorded Parker soliciting the payment, and arrested Parker after the transaction with the $500 SBI funds in his possession.

---

[150]  Dk. 118 at 69:3–70:11, 71:15-22.

[151]  For the referenced details about Parker's plea and sentencing, see generally Dk. 90-4 (Parker Guilty Plea).

-37-

During Parker's sentencing hearing, the prosecutor explained that she prosecuted at least 50 cases that Parker had investigated, including cases while Parker was embedded in Grove View Terrace, and that she had to dismiss about 15-20 cases because of Parker's misconduct. The prosecutor further testified that Parker made "hinky" deals with "some snitches" and that some of the snitches complained to other police officers that they were not paid what they were promised and that it was possible that Parker "beat them out of some money." She also testified that she and Parker were "very close friends," that he was "very depressed," and that he had a need for money.

When Hailey was killed, Williams was out on parole for convictions related to manslaughter, armed robbery, and a common law robbery.[152] Williams's parole had begun just two months before, in late October 1989.[153] In violation of his parole, Williams used crack cocaine and frequently begged for crack cocaine on the street.[154] Multiple persons, including Ballard, stated that Williams was a "crack head."[155] While Williams falsely testified at McKoy's trial that he had stopped using crack cocaine before the trial, he admitted that he was still using

---

[152] Dk. 90-9 at 43:7-12.
[153] Dk. 90-9 at 45:1-3.
[154] Dk. 118 at 1-90:13-21, 1-96:8-11; Dk. 117 at 118:24-119:4.
[155] *Id.*

-38-

crack cocaine before and after the fatal shooting of Hailey.[156] Williams's
continued use of crack cocaine was grounds for revoking his parole.[157]

Consistent with the other "snitches" who Parker did not pay in full, Williams
complained to multiple people, including his fiancée and McKoy's private
investigator, that the police only paid him half of the $1,000 they had promised
him for "snitching."[158]

Ballard and Parker used other questionable tactics to elicit statements against
McKoy. For example, the police attempted to obtain a statement from Charmaine
Evans,[159] who Williams said was with McKoy during the shooting. During an
intense interrogation, Evans was supplied with information that he could either
confirm and be released on an unsecured bond, or deny and risk a life sentence.[160]
Evans, who was sixteen at the time, provided a statement implicating McKoy and
including the information the police supplied.[161] The next day, and on multiple
occasions since, Evans admitted that his statement was false,[162] including to his
attorney the day after his statement was made and the assistant district attorney

---

[156] Dk. 90-9 at 62:16-63:7.
[157] Dk. 90-9 at 147:15-22.
[158] Dk. 90-6 at ¶ 20; Dk. 90-9 at 250:15-24, 255:12-16.
[159] Dk. 118 at 74:11–75:1.
[160] Dk. 118 at 74:11–75:14.
[161] Dk. 118 at 74:11–75:14, 80:15–81:3.
[162] Dk. 118 at 74:11-75:1, 80:12-82:18.

before trial.[163]  Evans also stated that the investigators refused to include details in his statement that were inconsistent with their case (e.g., gun caliber).[164]

Despite Evans's disavowal of his statement, Ballard testified at McKoy's trial that he obtained corroborating evidence from the interviews of McKoy's co-defendants,[165] presumably Evans.  None of the "co-defendants" testified at trial. The State asked Evans to testify but he said he would "testify on [McKoy's] behalf and tell the truth."[166]  Later that same day, the police arrested Evans for past parole violations and put him in the county jail, where he remained through McKoy's trial.[167]

No reasonable juror would find Williams's testimony credible in view of his admissions that he provided false testimony for cash, especially in combination with the evidence demonstrating that Parker interfered with other investigations and protected the Court Boys, the gang whose member, William Talley, was said to be responsible for Hailey's murder by eight witnesses.

---

[163]  Dk. 118 at 84:6–85:11.
[164]  Dk. 90-12 at 9.
[165]  Dk. 118 at 1-84:6–1-85:11.
[166]  Dk. 118 at 98:10-99:11.
[167]  Dk. 119 at 84:20-86:15.

-40-

### 3. Police Were Present at the Scene and the FPD Knew It at the Time of McKoy's Trial.

Before McKoy's trial, the FPD found it significant that there was a police presence at the time and place where they determined that the shooting occurred.[168] For example, at the federal court evidentiary hearing, Campbell testified that "when we heard that there was a shooting and where it was, we were upset because we have to answer to our supervisor if, you know, did that happen on our shift?"[169] Ballard also testified that he knew Campbell and the rest of the response team, was on scene at Bryan and Branson Streets.[170]  Given their presence, Ballard recognized that it was impossible for the shooting to have occurred between 11:00 p.m. and 12:00 a.m.,[171] even though that was the time he noted in the Felony Investigative Report.[172]  Ballard made the notation of that time on the basis of witness statements, including Williams's, each of which either explicitly or implicitly relied on the shooting happening at about 11:00 p.m.– 12:30 a.m.,[173] even though Ballard knew that the FPD's emergency response team was patrolling Branson and Bryan Streets at the time.[174]

---

[168] *E.g.*, Dk. 117 at 102:4-12.
[169] Dk. 117 at 8:13-9:9.
[170] Dk. 117 at 95:3-96:8.
[171] Dk. 117 at 97:11-98:3.
[172] Dk. 90-11 at 3.
[173] *See* Dk. 90-11 at 3.
[174] Dk. 117 at 95:11-18.

While the State was aware of the discrepancy, and found it significant, it did not disclose this information to the jury during McKoy's trial.[175]  During the federal court evidentiary hearing, Ballard testified that the shooting may have occurred hours later.[176]  The only record of a later shooting is a report by someone about a mile from Haymount Hill saying he heard shots from that direction at about 3:30 a.m.[177]  Those shots were not confirmed.

The State was also aware that the arcade Williams said he and Hailey entered had closed by about 9:30 p.m.[178]  Therefore, if the shooting occurred at 3:30 a.m., that would have been six hours after the arcade closed, rendering Williams's timeline utterly implausible.  The State did not correct Williams's testimony on these points, and Ballard simply repeated it without correction during his own testimony.[179]

### C. Talley Shot and Killed Hailey

The evidence against Talley includes statements from eyewitnesses, police records that Talley had and used the type of gun used to kill Hailey, and tips to the detectives investigating the Hailey shooting that contemporaneously link Talley as the shooter with Hailey as the victim.

---

[175]  Dk. 117 at 102:18-103:3.
[176]  Dk. 117 at 98:13-98:21.
[177]  Dk. 19-24.
[178]  Dk. 117 at 60:17-24.
[179]  Dk. 90-9 at 132:1-17.

### 1. Eight Eyewitnesses Identify Talley as the Shooter

Unlike the McKoy trial in which the State relied only on Williams, eight eyewitnesses tie Hailey to the Talley shooting in Grove View Terrace. Many of the witness statements implicating Talley as the shooter were obtained by law enforcement during a federal joint task force investigation of the Court Boys gang after McKoy had been convicted on Williams's statement alone.[180] Indeed, on the basis of the witness statements obtained by the joint task force, and some witness testimony at Talley's trial, it was explained at Talley's sentencing hearing that Talley was the only shooter, even though there was a man convicted of the shooting in state court.[181]

One eyewitness recognized Hailey and identified him by name. Each of the other witnesses stated that the car they saw Talley shoot at was found the next morning in an embankment near the intersection of Rowan Street and Murchison Road (across from a local establishment called Vic's). That is precisely where Hailey was found dead in his car, and comprehensive FPD homicide records from May 1988 to February 1991 show that Hailey's car was the only one recovered at that location with a body in it during that time.[182]

---

[180] *E.*g., Dk. 91-12.
[181] Dk. 92-24 at 8:24-10:7 (Talley Sentencing Hearing Tr.).
[182] Dk. 92-21 at 1-2; *see also* Dk. 92-22.

These eyewitnesses provided other details consistent with the Hailey shooting. For example, two of the three eyewitnesses who provided a description of the car said it was a blue Honda Accord, which is the same color, make, and model of the car in which Hailey's body was found. Another three eyewitnesses related the victim of the Talley shooting to the victim in the McKoy trial, *i.e.*, Hailey. As indicated below, the testimony and statements of four witnesses were obtained through a joint task force that comprised federal, state, and local law enforcement personnel that investigated gang-related activity in the county.[183]

The details of each eyewitness's recollection follow and are summarized on a chart in **Appendix B**.

- **Bernard McIntyre** is a former Court Boys member that provided a sworn statement about the Talley shooting in July 2007, after he had completed a sentence for crimes committed as part of the Court Boys gang. He stated, "I was familiar with Myron Hailey because he regularly purchased crack cocaine from our group. I was also familiar with his light blue Honda Accord." He further stated that one night, in January 1990, "I approached Myran [sic] Hailey's car and saw his face and recognized him. Then William Talley offered to make a drug sale to him, but Mr. Hailey snatched the drugs and drove off without paying. I saw William Talley pull out a gun and shoot Mr. Hailey's car. He fired several times. In the following days I learned that a man had been shot and killed in a light blue Honda Accord the night I saw William Talley shoot at the blue Honda Accord."[184]

- **Kelly Debnam** is a former Court Boys member who was arrested by the joint task force. During Talley's trial, Debnam, who was cooperating

---

[183] Dk. 91-12.
[184] Dk. 92-16.

with the government as part of a plea agreement,[185] testified that one night he was standing with Talley on a corner in Grove View Terrace when a car approached.[186]  Talley and another Court Boys member went over to make a sale, but "something went bad, and the car pulled away, and Mr. Talley fired at it.[187]  And after the car got down the street a bit, it slowed down, as if – you know, something might have went wrong in the car, like it had been hit.[188]  And the brake lights came on, and then they wobbled on out, you know, like they was drunk after that and pulled on out of the projects."[189]  Debnam said he saw the car the next day in the embankment off of Murchison Road,[190] which is where Hailey's car was found.

- **Ronald Perkins** is a former Court Boys member who was arrested by the joint task force.  During Talley's trial, Ronald Perkins testified that he was cooperating with the government as part of a plea agreement.  During his testimony, and in an interview with investigators following Talley's trial, Ronald Perkins stated that he was in Grove View Terrace very early one morning when he heard a car accelerate quickly.  He looked up and saw Talley standing on a corner.  Talley then fired six to seven shots at a car from "a large handgun."  Ronald Perkins "saw the car's brake lights come on and the vehicle slow dramatically," making a slow wide turn out of Grove View Terrace.  Later in the morning, "just after the sun had risen," he saw the "same vehicle that Talley had shot at off of the side of the road.  The victim's car was off of Rowan Street, opposite of Vic's Drive-In, facing towards Murchison Road."  The orientation of the car Ronald Perkins matches the orientation of Hailey's car when it was found.  Ronald Perkins further stated that he "later found out that the driver of the car had been killed and that someone from Haymount Hill [where McKoy lived] had been arrested."[191]

- **Anthony Perkins** is a former Court Boys member.  He was present during the federal investigators' interview of his brother, Ronald Perkins.

---

[185]  Dk. 92-3 at 214:8-215:7.
[186]  Dk. 92-3 at 224:11-18.
[187]  Dk. 92-3 at 224:20-24.
[188]  Dk. 92-3 at 224:25-225:6.
[189]  Dk. 92-3 at 224:5-225:6.
[190]  Dk. 92-3 at 225:7-15; *see* Note 182.
[191]  Dk. 92-2 at 133:24-135:19; Dk. 90-38; *see* Note 182.

The investigators' report noted that Anthony Perkins was also "present in Grove View Terrace the night of the shooting. Anthony Perkins related that he recalled the events as reported here . . . ." Anthony Perkins was also with his brother when he saw the wrecked car across from Vic's.[192]

- **James Smith** is a former Court Boys member who grew up with Talley. In 2013, he told one of McKoy's attorneys that he saw Talley shoot Hailey, who was in a blue Honda in Grove View Terrace. Smith stated that the bullets Talley fired "couldn't have missed" and that he later saw the Honda in the embankment on Rowan Street, across from Vic's.[193]

- **Craig Roberts** is a former Court Boys member who was interviewed by Task Force investigators. In his interview, Roberts stated that he and another Court Boys gang member were counting bags of marijuana when he heard a car taking off, followed by a shot. After that first shot, he looked and saw Talley "shooting at a car that was travelling away from him . . . . William Corrie Talley fired six shots at the car and after the sixth shot, Roberts heard a scream from the driver of the car," after which it stopped, lurched forward, and then traveled slowly, weaving out of sight. Roberts did not recall the color of the car, but remembered that it was a "small car, possibly a Toyota." The other Court Boys gang member that Roberts was with told Talley, "Boy you hit him, I don't care what you say, you hit him." William Corrie Talley replied, "Shut up nigger, I know . . . shouldn't have taken my shit." According to the federal investigators, Roberts heard the next day that the car Talley had shot was seen off the side of the road near Vic's with police standing around it.[194]

- **"Jane Doe,"**[195] who lived in Grove View Terrace in January 1990,[196] testified at the federal court evidentiary hearing that, while she was

---

[192]  Dk. 92-18; *see* Note 182.

[193]  Dk. 92-17; *see* Note 182.

[194]  Dk. 92-20; *see* Note 182.

[195]  Documents identifying the name of "Jane Doe" and "John Doe" have been sealed by the District Court for the protection of those witnesses. (*E.g.*, Dk. 84 at 4.) While Jane Doe testified openly during the evidentiary hearing, her name is not disclosed here out of an abundance of caution to ensure compliance with the related District Court order.

[196]  Dk. 118 at 57:11-17.

-46-

sitting on her porch one night, she saw a white or yellowish-white car approach a group of men.[197] These men "start shooting, the car went back out. I ain't thought about it no more. I just went to bed. So the next morning, I went to Vic's to get me something to eat. And coming out, I saw that same car in a ditch, like. I said. 'Oh, my god, that's the same car.'"[198]

- **"John Doe"**[199] provided a sworn statement that he was in Grove View Terrace in January 1990 when a shooting occurred. He explained that "[w]hen the first shot took place, I immediately ducked my head down, so I did not see who did the shooting. I do know that the victim and his vehicle were found the next day across from Vic's."[200]

### 2. Talley Had and Used The Type of Gun Used in the Hailey Shooting.

An analysis of the bullets recovered from Hailey's car revealed that it was "fired from a revolver only, probably a Ruger, a Taurus, or a Smith & Wesson .357 magnum."[201] Fifteen days before Hailey was shot and killed, Talley was arrested for "discharg[ing] a .357 black Hawk Ruger revolver in the city limits of Fayetteville, North Carolina."[202] James Smith also stated in an interview with federal investigators that Talley regularly carried a .357 caliber revolver.[203] In at least one other occasion, Talley was arrested with a .357 caliber revolver in his

---

[197] Dk. 118 at 57:18-58:19.

[198] *Id.*; *see* Note 182.

[199] *See* Note 195.

[200] Dk. 93-7; *see* Note 182.

[201] Dk. 90-9 at 284:19-286:11.

[202] Dk. 92-1 at 12.

[203] Dk. 92-8 (James Smith stated in an interview that Talley "always carried a gun, usually a 9mm handgun or a .357 caliber revolver"); *see also* Dk. 92-2 at 192:16-22 (Steve Evans testified that Talley carried a revolver or a 9 mm handgun).

possession.[204]  Talley's .357 black Hawk Ruger revolver is consistent with Ronald

Perkin's recollection that Talley shot at the back of the car with "a large handgun"

(as described above).

### D. The Witnesses Not Called By the State for McKoy's Trial Are Not Credible

The District Court stated that "investigators received statements from two

witnesses, who were not called to testify at trial, which largely support Williams's

version of events."[205]  These two witnesses are Kibbie Johnson and Charles

Williams.[206]  According to their statements, Johnson placed the shooting at

approximately 12:00 a.m. and Charles Williams placed it at about 11:30 p.m. –

12:30 a.m.  As described above, the police were still present at the intersection of

Bryan and Branson Street at these times, making their accounts impossible.[207]

Additionally, Ballard told Johnson that there would be "heat" unless he

cooperated.  Johnson originally suggested that Hailey was killed in a shooting that

involved "Dennis Fortes Boys," and not McKoy.[208]

When the police originally asked Charles Williams if he knew about a

homicide on Bryan Street, he replied that he only knew "what he read in the

---

[204]  Dk. 92-9 at 91:11-15; Dk. 92-1 at 7, ¶ 12.
[205]  Dk. 131 at 10.
[206]  Dk. 90-11 at 4.
[207]  Dk. 90-11 at 3-4.
[208]  Dk. 90-8 at Narrative 53-54.

paper."[209]  When questioned further, Charles Williams an account that conflicted

with Williams's and Johnson's.  For example, he states that he could only see as

far as the yellow house on the corner, but Williams placed the shooting farther up

the street.[210]

### E.  It is More Likely than Not that No Reasonable Juror Would Find McKoy Guilty Beyond a Reasonable Doubt.

After laying out all the evidence, a holistic review must make a probabilistic

determination of how a reasonable juror would respond to the evidence.  Here, it is

clear that no reasonable juror would vote to convict.  The State's case is built

around a single purported eyewitness, whose testimony is now acknowledged to be

largely false.  The District Court concluded that jurors could disregard the

falsehoods but still credit Williams's testimony in light of McKoy's "confession."

As explained above, this conclusion was not properly determined by evaluating the

totality of the evidence through the requisite holistic review.  Rather, it was

evaluated under a sufficiency test, with the purported confession at the center of it.

Under the correct review, no reasonable juror would convict McKoy on the

basis of Williams's testimony in light of the compelling evidence that (1) Talley,

not McKoy, shot Hailey, and that the shooting occurred in a different section of

Fayetteville; (2) the FPD emergency response team was present at the very

---

[209]  Dk. 90-8 at Narrative 89.
[210]  *See* Dk. 90-11 at 3-4; Dk. 90-8 at Narrative 91.

location, and at the exact same time, where the State alleged, through Bobby Williams's testimony, McKoy shot Hailey; (3) when one of the investigating officers had a proven history of protecting members of Talley's drug gang; (4) when the first two tips received by the FPD indicated that Talley was responsible; and (5) where the tips and other exculpatory evidence was withheld from the defense.

Finally, the purported "confession" would not change the outcome of this holistic review, as the objective evidence makes plain that no confession occurred. Even if one were to strain these statements to the degree necessary to see them as a confession in light of the record, then McKoy's thirty-year effort to prove his innocence, and the statements made immediately after the purported confession, is more than enough to provide the repudiation of these statements sought by the Magistrate Judge.  Therefore, the "confession" does not preclude McKoy from establishing his innocence and, when viewed in light of the evidence as a whole, it is clear that he has met the exacting standard to pass through the gateway and have his constitutional claims heard on the merits.  *See House*, 547 U.S. at 537; *Finch*, 914 F.3d at 294, 299, 302.

## CONCLUSION

For the foregoing reasons, Appellant requests that the Court grant a

Certificate of Appealability to review the issue identified above.

Respectfully submitted,

/s/ Jamie T. Lau_____
Jamie T. Lau
N.C. Bar No. 39842
Wrongful Convictions Clinic
Duke University School of Law
Box 90360
Durham, North Carolina 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262
E-mail: jamie.lau@law.duke.edu

*Counsel for Petitioner-Appellant*

Dated: May 26, 2020

## Appendix A

This inv received a call from Officer Phillips #149 advising that he had the vehicle stopped at the intersection of Highland + Arsenal.  This inv arrived at the intersection of Highland + Arsenal.  Upon my arrival I observed Officer Phillips, Rockwell + Christy who had a vehicle stopped.  I approached McKoy's car on the driver's side. I observed McKoy sitting in the vehicle.  A passenger, James Bethune was standing beside the vehicle on the passenger side and appeared to be intoxicated.

I told McKoy that I needed to speak with him and asked him to come to my vehicle. McKoy didn't say anything but exited his vehicle and came back to my unmarked unit. I entered my unit, reached across, unlocked the passenger side door, at which time McKoy entered the vehicle and closed the door. McKoy asked this inv what did I want to talk to him about. I advised a murder. McKoy stated I'm not going to talk to you about that shit and started to exit the car.

I advised McKoy he could talk to me now or talk to me later about it but either way he wasn't driving his car because it had no insurance on it. McKoy stated okay man. I advised McKoy that his name has come up in investigation and it came up as he was the shooter. McKoy replied "man I don't even shoot at cars. I advised McKoy that he was lying, because he shot at a car Monday night.  McKoy smiled and asked what I was talking about.

I advised McKoy that a man drove up in front of Thompson's house to purchase some drugs and ac, Fred, and Chris went to the car to service it and Ant Lee tried to snatch the man's money and he drove off with the drugs without paying for it. McKoy replied "I know it."  I then stated that McKoy told everyone to move and he shot at the car with an automatic weapon and ac, Fred + Chris told him that he had better quit shooting at cars because he shot at one already and a man was killed. McKoy replied with a smile on his face "I know it."

This inv then stated "the night you shot Myron Hailey, you did so because he ripped you off. McKoy replied I know it. I stated that Hailey got into his car and started driving away and he shot him, bam, bam. McKoy replied I know it. I then said "you, Ant Lee, Cat + Charmain ran thru the path and came out on the corner of Davis + Arsenal and when Hailey turned down Davis he shot again and Hailey started swerving from side to side. McKoy replied I know it. I then stated to McKoy that I knew he knew it and that him, Ant Lee, Charmain and Cat were going down for it. McKoy was still smiling and did not reply.

I told McKoy that his only problem was that Ant Lee, Cat + Charmain was going to roll over on him. McKoy became angry and stated "they might roll over on me but I ain't saying anything. I asked McKoy if he was innocent of what the witness was saying. McKoy didn't reply. I asked McKoy if he would take a polygraph test so we could eliminate him.  He smiled and said "no man."  I then asked him if he would come to the LEC so I could take a polaroid picture of him. McKoy asked why I wanted his picture. I advised him "to show the eyewitness along with the other photos to see if McKoy was the man he was talking about. McKoy replied "no man." I told McKoy that in my opinion a[n] innocent man would want to take a polygraph and have his picture taken to prove he was telling the truth.

McKoy just smiled and asked if he could go now. I stated sure. He exited my vehicle at 1405 hrs. During the interview McKoy also stated "you don't even know what type of bullet was used. I stated yes I do, it was a .357. McKoy quit smiling and didn't reply.

(Dk. 91-1 at 54-57 (line breaks are added).)

**Appendix B**

| Witness | Talley Was Part of a Drug Deal Gone Wrong | Talley Shot at the Back of a Car | The Car was a Blue Honda Accord | The Wrecked Car was Found in the Embankment | Hailey was The Victim |
|---|---|---|---|---|---|
| Bernard McIntyre | ✓ | ✓ | ✓ | | ✓ |
| Kelly Debnam | ✓ | ✓ | | ✓ | |
| Ronald Perkins | ✓ | ✓ | | ✓ | ◍ |
| Anthony Perkins | ✓ | ✓ | | ✓ | |
| James Smith | ✓ | ✓ | ✓ | ✓ | ✓ |
| Craig Roberts | ✓ | ✓ | | ✓ | ◍ |
| "Jane Doe" | ✓ | ✓ | ✗ | ✓ | |
| "John Doe" | ✓ | ✓ | | ✓ | |

✓:  Fully consistent

◍:  Some details consistent

✗:  Some details inconsistent

(*See* Section II.C.1.)

- 56 -

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,454 words, which includes appendices but excludes the parts of the brief exempted by Fed. R. App. P 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14pt Times New Roman.

<u>/s/ Jamie T. Lau    </u>

*Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 26th day of May, 2020, I caused this

Appellant's Informal Brief to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to

the following registered CM/ECF users:

> Clarence Joe DelForge, III
> N.C. Department of Justice
> P.O. Box 629
> Raleigh, NC 27602

> /s/ Jamie T. Lau

> *Counsel for Appellant*