RECORD NO. 20-6598

In The

# United States Court of Appeals

## For The Fourth Circuit

# LAMONT MCKOY,

*Petitioner – Appellant,*

**v.**

# ERIK A. HOOKS,

*Respondent – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

———————

## REPLY BRIEF OF APPELLANT

———————

Jamie T. Lau
Evan Glasner
DUKE UNIVERSITY SCHOOL OF LAW
210 Science Drive, Box 90360
Durham, North Carolina 27708
(919) 613-7764

John P. Nowak
Amanda Pober
Mark Russell Sperling
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

*Counsel for Appellant*                    *Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ......................................................................1

ARGUMENT ...........................................................................2

I.    The totality of the evidence establishes that McKoy meets the actual innocence gateway standard ......................................2

    1.    The State's case at trial relied on weak, factually inconsistent evidence ........................................................3

        a.    Williams's eyewitness testimony was both inconsistent and implausible ..................................3

        b.    McKoy did not confess to the crime ......................7

    2.    Evidence the State decided not to present at trial is unreliable and unpersuasive.......................................... 10

    3.    The State suppressed key evidence establishing McKoy's innocence and rendering the case presented by the State at trial impossible ..................... 15

        a.    New evidence of Fayetteville Police officers at the exact location, and at the exact time, that the State placed the shooting renders its already weak case impossible............................. 15

        b.    New evidence that William Talley murdered Hailey, not McKoy, further supports McKoy's actual innocence. ................................ 18

            1.    The Talley evidence is "new .................... 18

2.    The State has repeatedly benefitted from its suppression of the Talley tips, and it continues to try and benefit from such suppression before this Court........................................ 20

3.    New, reliable evidence shows Talley was the shooter.......................................... 23

CONCLUSION............................................................................................. 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bouie v. United States*,
    No. CR 3:08-0946, 2014 WL 958274 (D.S.C. Mar. 10, 2014).......... 11

*Carrillo v. County of Los Angeles*,
    798 F.3d 1210 (9th Cir. 2015) ........................................................... 23

*Finch v. McKoy*,
    914 F.3d 292 (4th Cir. 2019) .............................................. 3, 18-19, 27

*Fontenot v. Crow*,
    4 F.4th 982 (10th Cir. 2021) .............................................................. 10

*House v. Bell*,
    547 U.S. 518 (2006) ............................................................................3

*Long v. Hooks*,
    972 F.3d 442 (4th Cir. 2020) ............................................................. 19

*McKoy v. Hooks,*
    Case No. 5:16-hc-02262, Dkt. No. 23-4 (E.D.N.C. Sep. 7, 1997)..... 11

*Reeves v. Sci.*,
    897 F.3d 154 (3d Cir. 2018) .............................................................. 10

*Schlup v. Delo*,
    513 U.S. 298 (1995) .......................................................................... 18

*State v. McKoy,*
    331 N.C. 731, 417 S.E.2d 244 (1992) ..................................................9

*State v. McKoy*,
    417 S.E.2d 244 (N.C. 1992) .............................................................. 10

*Teleguz v. Pearson*,
　　689 F.3d 322 (4th Cir. 2012) .................................................................3

*United States v. Keller*,
　　No. 5:10CR00015, 2014 WL 55661 (W.D. Va. Jan. 7, 2014) ........... 11

*United States v. Sanchez*,
　　118 F.3d 192 (4th Cir. 1997) ............................................................ 11

*United States v. Scheffer*,
　　523 U.S. 303 (1998) ........................................................................... 11

*USA v. Perkins et al.*,
　　Case. No. 3:94-cr-00065, Dkt. No. 111 (E.D.N.C. Sep. 13, 1994) .... 26

iv

Petitioner-Appellant, Lamont McKoy, files this Reply Brief, pursuant to this Court's Order filed August 16, 2022.  (DE 44.)

## INTRODUCTION

In light of new evidence that the State suppressed, the State's theory of Myron Hailey's murder presented at trial is simply impossible.  The State and its sole, purported eyewitness, Bobby Lee Williams, placed Hailey's murder at the intersection of Bryan and Branson Streets in the Haymount Hill neighborhood of Fayetteville, North Carolina on January 25, 1990.  But new evidence suppressed by the State reveals that police were present at that exact intersection from 9:49 p.m. to at least 12:41 a.m., and none of the police officers present reported a shooting at that location.  The State also suppressed tips that another man, William Talley, murdered Hailey.  Despite this evidence showing the implausibility that McKoy committed the murder, the State forged ahead to trial with its untenable theory.

Now, unable to grapple with the light shone on this once suppressed evidence and new evidence that has surfaced since McKoy's trial, Respondent resorts to attacking McKoy's character in an attempt to obfuscate the strong evidence of his innocence.  But, despite this attempt, it is indisputable that he has never been charged with any drug offense or another violent crime.  More relevant to this Petition, none of Respondent's arguments change the current

reality: the State concealed exculpatory evidence for decades that completely undermines its case and proves McKoy is innocent. The totality of the evidence establishes that McKoy satisfies the actual innocence gateway because no reasonable juror would find him guilty beyond a reasonable doubt.

## ARGUMENT

McKoy satisfies the actual innocence gateway because the totality of the evidence establishes that it is more likely than not that no reasonable juror could find him guilty beyond a reasonable doubt. Namely, the totality of evidence shows that: (1) the State's evidence of McKoy's guilt at trial was weak and riddled with inconsistencies and flaws; (2) new evidence the State suppressed reveals that the police were present at the purported scene of the crime, rendering the State's trial theory completely implausible; and (3) the State suppressed evidence that William Talley was the shooter and new evidence has come to light since McKoy's trial making clear that Talley, not McKoy, is responsible for the murder of Myron Hailey.

**I.    The totality of the evidence establishes that McKoy meets the actual innocence gateway standard.**

To meet the actual innocence gateway, the Court must consider all evidence – both new and old, exculpatory and incriminating. The innocence gateway is satisfied if the petitioner "demonstrate[s] that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond

a reasonable doubt." *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)). Actual innocence "does not require absolute certainty about the petitioner's guilt or innocence." *Id.* Rather, petitioner must satisfy the preponderance standard— in other words, that it is "'more likely than not any reasonable juror would have reasonable doubt' as to the petitioner's guilt." *Teleguz*, 689 F.3d at 328 (*quoting House v. Bell*, 547 U.S. 518, 538 (2006)).

### 1. The State's case at trial relied on weak, factually inconsistent evidence.

#### a. Williams's eyewitness testimony was both inconsistent and implausible.

As explained in Petitioner's Opening Brief (Pet. Br. pp. 20–31), contrary to Respondent's arguments, the trial testimony of the State's sole purported eyewitness—Bobby Lee Williams—was unreliable and demonstrably false. All of the evidence cited by Respondent to bolster Williams's testimony is inaccurate and unreliable.

First, Respondent cites Williams's testimony where he said he received nothing for his testimony (Resp't Br. p. 36), but that testimony is contradicted by other evidence in the record. Williams's fiancée provided an affidavit that Williams told her the police had paid him $500 for "snitching" on McKoy— half of the $1,000 bribe the police promised—and that he "did not see

[McKoy] do the shooting." (JA 316.) A private investigator retained by McKoy similarly testified at trial that Williams had told him he "was getting a little mad because the police had promised him a thousand dollars, but he had not received any of it." (JA 1714.) These accounts are not only consistent with each other, including the dollar amount of the bribe, but are also consistent with evidence of Detective Robert Parker's corruption, an investigator assigned to the Hailey murder case. (JA 1837-38, 1997.)

Additionally, as Respondent correctly points out, Williams, a parolee and admitted crack addict, could have had his parole revoked because he was in an area where drugs were known to be sold.[1] (*See* JA 1522, 2016, 2022, 2224–25.) Thus, the police also had significant leverage to pressure Williams, and he had significant incentive to testify in a manner that implicated McKoy.[2] Williams's testimony was—and still is—irreparably unreliable.

---

[1] Respondent also suggests that Williams's testimony is to be believed because McKoy allegedly threatened to kill him. (*See* Resp't Brief p. 40.) But McKoy was never charged nor had his bond revoked for these alleged threats and altercations, and, given the overwhelmingly inconsistent nature of Williams's testimony, there is no reason that his unsubstantiated allegations here should be deemed reliable.

[2] Notably, Williams did not come forward immediately to speak with the police; rather, he was not identified until 25 days after Hailey's death. (JA 88.)

Second, the State claims that Williams's testimony was credible. (Resp't Br. p. 43.) But Williams's tale about confronting McKoy with Hailey and then witnessing the shooting is impossible and directly contradicted by the record. As to confronting McKoy, Williams's story was anchored to the neighborhood arcade; he mentioned it more than thirty times during his testimony. Williams testified that he and Hailey went *inside* the arcade looking for McKoy (JA 1506), but, as noted in the investigator's running report, the arcade closed at about 9:30 p.m. (JA 73), a time when Hailey was known to be in Clinton, North Carolina. (*See* JA 1730-31 (confirming Hailey was in Clinton, NC, at 8:55 p.m., approximately 45 minutes from Haymount Hill).)

Williams's testimony about witnessing McKoy shoot Hailey's car is even more farfetched. His account would have required him to run about 780 feet along a dark, unpaved path faster than Hailey drove 870 feet of paved road. (JA 318.) The speed required to accomplish such a feat is not humanly possible. (*See* JA 318 (explaining that a speed of 31.4 mph would have been required to witness the shooting).) Williams's story of his interactions with Hailey and McKoy the night of the murder is fundamentally implausible.

Third, Respondent suggests a connection between a recovered unspent .357 bullet found in a vacant lot and Hailey's murder. However, as

Respondent concedes, Ballard testified there was "no way" he could connect that bullet to Hailey's murder. (Resp't Br. p. 37 n.3; JA 1632–33.) And, in contrast to the State's baseless suggestions about this unspent bullet, McKoy has demonstrated that Talley possessed and used the type of weapon used to kill Hailey just fifteen days before the shooting. (JA 2448.) Respondent's unsupported assertion regarding this evidence should be entirely disregarded, as it has no relevance to this case or McKoy's guilt or innocence, especially in light of the new evidence.

Finally, Respondent cites the trial testimony of Leslie Finley and Erwin Jones. (Resp't Br. p. 38.) This testimony provides no support for the State's theory of the case. As Respondent admits, Finley testified that she saw Dennis Fort shoot at Hailey's vehicle, and that she did not even see McKoy at the scene of the shooting.[3] (JA 1651.) Finley also testified that she saw Hailey's car and the shooting occur sometime around 8:45 p.m. when the power went out, but that testimony directly contradicts Williams's testimony that he did not see Hailey until after the power had been restored. (JA 1651–55, 1662, 1725.) As for Jones, he testified that he saw a blue vehicle pass by around 8:20 to 9:00 p.m., heard shooting, and then saw the power go out. (JA 1678–

---

[3] As discussed at trial, the Dennis Fort shooting is another incident entirely separate from Hailey's murder. (*See, e.g.*, JA 1650-1657, 1712.)

79.)  He further testified at trial that he did not see McKoy that night.  (JA 1682.)  Finley and Jones do not corroborate Williams's impossible testimony. Instead, they demonstrate the error of crediting a single, flawed eyewitness account that is consistently contradicted throughout the record.

### b.     McKoy did not confess to the crime.

A review of the exchange between McKoy and Ballard, coupled with Ballard's subsequent, contemporaneous actions, confirm that McKoy's statements to Ballard did not constitute a confession, despite Respondent's assertions that this is "arguably the most compelling piece of evidence the State presented" at McKoy's trial.  (Resp't Br. p. 33).  McKoy responded to every question Ballard asked with "I know it"—even to things Ballard knew were not true.  (JA 104–05.)  Ballard's contemporaneous notes are devoid of any reference to a confession.  (*See id*.)  Rather than arresting McKoy, Ballard asked McKoy to take a polygraph test "*so we could eliminate him*."  (JA 215 (emphasis added).)  And just days after his exchange with McKoy, Ballard reported that there was "minimal" evidence in the case.  (JA 105.)  Ballard's actions following his exchange with McKoy and his contemporaneous notes should preclude interpreting the conversation between McKoy and Ballard as a confession.

Nonetheless, undeterred, Respondent argues that Ballard's actions and notations show McKoy confessed, and that the full notation in the felony investigative report supports Ballard's testimony at the federal evidentiary hearing that he believed McKoy admitted his guilt. (Resp't Br. p. 35.) To the contrary, the added text confirms that not only did Ballard write in the felony investigative report, which he submitted to the district attorney's office, that all defendants *except* McKoy made incriminating statements, but he also held out hope that one of the other defendants would "roll over" on McKoy. (JA 154, 2217.) This sentence further shows that McKoy had not confessed, which is why Ballard believed he needed a codefendant to provide testimony inculpating McKoy.

Respondent argues that Ballard was only describing the interview after McKoy's arrest, but Ballard's notes appear under a section asking the officers to provide "any other comments . . . concerning this case, or the individual Defendant(s)." (*See* JA 154.) There is no justifiable reason why Ballard would not state that there had been a confession under this important, open-ended section of the report. Further, any argument that Ballard's actions and notations are evidence that he did not want to rush to judgment strains credulity. (Resp't Br. p. 35.) It is unreasonable to believe that the police thought McKoy confessed to murder, yet allowed him to walk free. The more

plausible explanation is precisely what is documented in the records—McKoy did not confess and Ballard never believed he had.

Finally, Respondent also argues that the lower court decisions demonstrate the reasonableness of finding McKoy confessed, but none of the other court decisions properly considered the totality of the evidence. The North Carolina Supreme Court concluded that if the jury believed Ballard "it reasonably could have found" McKoy confessed, but that finding was based on the limited trial record and not the totality of the evidence currently before this Court. *State v. McKoy,* 331 N.C. 731, 734, 417 S.E.2d 244, 246 (1992). Critically, when Ballard testified at trial, the jury did not hear about his contemporaneous notes and actions, the police presence at the exact time and location the State argued the crime occurred, and evidence identifying Talley as the shooter.

Similarly, the federal magistrate judge (whose conclusions were adopted by the district court) improperly adopted the North Carolina Supreme Court's conclusion without making an independent finding based on the totality of the evidence. And, despite the limitations of the analysis, the magistrate judge still concluded "it can be argued" that "McKoy admitted to shooting Hailey"—far from a finding that McKoy in fact confessed. (JA 2381.) Thus, both the magistrate and district court considered only whether a

reasonable juror could have found McKoy confessed based on the evidence presented at trial. (*See State v. McKoy*, 417 S.E.2d 244, 246 (N.C. 1992); JA 2329.) But that evaluation is incorrect; it ignores the previously concealed evidence, which, as discussed above and below, undoubtedly undermines Ballard's trial testimony. When properly considering the entire record now before this court, no reasonable juror would conclude that McKoy confessed.

Finally, even if this Court were to conclude that McKoy's comments constitute a confession (which the comments do not), McKoy can still satisfy the innocence gateway under the correct totality of the evidence standard. *See Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021) (finding the actual innocence gateway satisfied despite a videotaped confession); *Reeves v. Sci.*, 897 F.3d 154, 165-66 (3d Cir. 2018) (holding that, under the totality of circumstances, a confession did not negate Petitioner's actual innocence claim). Here, the totality of the evidence demonstrates the impossibility of the State's theory at trial and consistently contradicts any alleged confession.

### 2. Evidence the State decided not to present at trial is unreliable and unpersuasive.

The evidence the State had in its possession and decided not to present at trial is weak and unreliable. First, Respondent points to two polygraph tests that it incorrectly claims corroborate Williams's testimony. (Resp't Br. p. 38.) An expert declaration presented to the district court, however, establishes that

Williams's polygraph was inconclusive.  (JA 2369; *see also McKoy v. Hooks*, Case No. 5:16-hc-02262, Dkt. No. 23-4 (E.D.N.C. Sep. 7, 1997) (Declaration of Mark D. Handler).)  Additionally, the Fourth Circuit has a per se ban on polygraph evidence.  *United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997).  This ban applies "whether the government or the defendant is seeking to introduce the evidence." *Id.*  Such a ban is also consistent with the United States Supreme Court's position that "there is simply no consensus that polygraph evidence is reliable." *United States v. Scheffer*, 523 U.S. 303, 309 (1998).  District courts in this Circuit similarly refuse to consider polygraph evidence in actual innocence cases.  *See, e.g.*, *Bouie v. United States*, No. CR 3:08-0946, 2014 WL 958274, at *8 (D.S.C. Mar. 10, 2014) (refusing to consider the defendant's polygraph results in his claim for actual innocence); *United States v. Keller*, No. 5:10CR00015, 2014 WL 55661, at *6 (W.D. Va. Jan. 7, 2014) ("Polygraph results are generally inadmissible as unreliable.").

Second, Respondent claims that statements from two individuals, Charles Williams Jr. and Kubbie Johnson, corroborate Williams's testimony. (Resp't Br. p. 38–39.)  However, Johnson originally suggested that Hailey was killed when Dennis Fort fired a shot, not McKoy.  (JA 87.)  Ballard obtained this statement implicating Fort on February 16, 1990 after threatening to slow the drug trade at the corner where Johnson was approached

11

and questioned while sitting in Ballard's police vehicle. (JA 86–87.) Notably, the February 16, 1990 interview of Johnson includes none of the information later relayed in the felony investigative report prepared by Ballard and relied upon by Respondent. (*Compare* JA 86–87 *with* JA 145.)

Charles Williams originally said he knew "only what he read in the paper." (JA 98.) And, although difficult to read, Ballard's handwritten notes make clear that Williams sought help from Ballard in exchange for providing a statement. Ballard's notes say that while Williams was incarcerated at the Scotland County Jail, Williams's wife "advised [him] that Charles wanted to see [Ballard] and Kathy [Rivenbock] that we could help him [sic].[4]" (JA 262.)

The apparent final statements of Johnson and Williams showcase that both went along with the impossible case being built by Detectives Ballard and Parker. They both purportedly claim the shooting happened between 11:00 p.m. and 12:00 a.m. (JA 145), the same time the FPD's emergency response unit was at the intersection where the State placed the shooting (JA 337; JA 2080-83). As noted below, FPD officers saturated the area looking

---

[4] It is inexplicable why Respondent believes these statements should be given any weight while simultaneously arguing that the Court Boys witnesses, who provide a consistent account of the shooting at great risk to themselves (including testimony under oath that is corroborated by others) should not be believed.

for criminal activity. (JA 2074.) They heard and saw no shooting. (JA 2087–88.)

Respondent also cites the statements of McKoy's "codefendants," James "Cat" Mitchell and Charmaine Evans (Resp't Br. p. 40–41), neither of which support the State's case. During the police interview that the State cites, Mitchell repeatedly stated that he was not with McKoy and did not witness McKoy shoot at anyone. (JA 106–07.) Mitchell stated that he "would even take a polygraph test." (JA 107.)

Charmaine Evans, who was only sixteen years old at the time, implicated McKoy only after the police handcuffed him to a chair and threatened him with life in prison if he refused to sign a statement. (JA 2000–01.) Afterward, Evans quickly notified the police that he had made a false statement. (JA 128.) Then, prior to McKoy's trial, Evans notified the district attorney that he intended to testify on McKoy's behalf. (JA 2010–11.) Despite the fact that he was incarcerated during the trial and unable to testify, Evans subsequently provided a series of letters to McKoy's counsel reiterating that his statement was false. (JA 2012, 324–35.) At the evidentiary hearing before the magistrate judge, Evans gave testimony that his original statement was false, that he provided it out of fear of being incarcerated, and that he was not with McKoy on January 25. (JA 2006–09.)

The State did not call any of McKoy's "codefendants" to trial as witnesses. (*See* JA 1458.) The State also dropped all of the accessory-after-the-fact charges against McKoy's codefendants that were pending at the time of their statements. (JA 148–49, 2005.) Despite the clear and complete unreliability of these statements, Ballard testified at McKoy's trial that he obtained corroborating evidence from his interviews of McKoy's codefendants. (JA 1627.) The State's continued use of these statements as corroborative evidence should carry no weight when it is evident that Mitchell did not witness a shooting and Evans's statement as a sixteen-year-old was coerced and immediately disavowed.

Finally, Respondent suggests tire tracks near the accident show Hailey was driving away from Haymount Hill toward Grove View Terrance when he was murdered. (Resp't Br. p. 41) McKoy's expert explained that none of the tire track patterns matched the tires on Hailey's 1986 Honda Accord. (JA 2247.) Respondent's own expert admitted that the tire tracks could have been left by a car other than Hailey's. (JA 2133.) Neither the magistrate judge nor the district court judge found that Hailey's car was moving in the direction that the State contends, and the State's claim that tire tracks demonstrate the direction Hailey was traveling has no evidentiary support given the tracks in question are different from the tire tracks on Hailey's 1986 Honda Accord.

3. **The State suppressed key evidence establishing McKoy's innocence and rendering the case presented by the State at trial impossible.**

   a. **New evidence of Fayetteville Police officers at the exact location, and at the exact time, that the State placed the shooting renders its already weak case impossible.**

Respondent's account of the State's case at trial is impossible in view of new evidence of heavy police presence around Bryan and Branson Streets between 9:49 p.m. on January 25th and at least 12:41 a.m. on January 26. With this evidence, no reasonable juror would find McKoy guilty beyond a reasonable doubt.

While Respondent admits that the timeline at trial was "not precise" and speculates that the shooting could have taken place sometime after 12:41 a.m. (Resp't Br. p. 44-45), the sequence of events that purported eyewitness, Bobby Lee Williams, laid out is clear and unmistakable. Williams placed the shooting not too long after he and Hailey went inside the arcade to look for the person who allegedly ripped off Hailey in a drug sale. This arcade was a central part of Williams's testimony and he mentioned it more than thirty times. (*See e.g.*, JA 1506.) Moreover, Williams testimony was unequivocal—he went *inside* the arcade to look for McKoy and saw patrons playing machines and shooting pool. (*Id.*) Williams left the stand and was later called back to testify on rebuttal that he first saw Hailey after power was restored to

the Haymont Hill area (JA 1725), which occurred at 11:15–11:30 p.m. (JA 1728). Because the arcade closed at 9:30 p.m. (JA 73), these two things cannot both be true.

Moreover, the State's case at trial clearly placed the shooting at the same time and location where the police were stationed. There is no dispute that the shooting did not happen before the police were on the scene at Bryant and Branson Street at 9:49 p.m. and, given Williams's testimony and the State's other evidence at trial, the police would have still been present at this location when the State alleged a murder occurred there. The record in this case shows an FPD investigation and trial focusing on a homicide occurring during the late night hours of January 25, not the early morning hours of January 26th. And while Respondent wants the Court to believe this distinction is trivial, the timeline is critical to understanding how incredible Williams's testimony was and the complete lack of evidence against McKoy. To the extent that Respondent says this "timeline was never put before the jury," (Resp't Br. p. 45), he seeks to take advantage of the fact that the State withheld evidence of the police presence on Haymount Hill.

At the district court evidentiary hearing, Sergeant Campbell testified that his police emergency response team was dispatched to the corner of Bryan and Branson Streets after the transformer was shot out on the evening of

January 25, 1990 and remained at the scene until at least 12:41 a.m. on January 26th.  (JA 2075, 2080.)  His testimony is corroborated by a police incident card documenting police presence from 9:49 p.m. on January 25 and staying until 12:41 a.m. on January 26.  (JA 337.)  Sergeant Campbell testified that the response team's practice at the time was to send at least ten police officers in unmarked police cars and "saturate that area."  (JA 2072.)  He confirmed that if someone was selling drugs on the corner of Bryan and Branson Streets that night, he would have observed it, and that he didn't hear any shots fired in the Haymount Hill area that night.  (JA 2083, 2087–88.)  In fact, when informed that Hailey's shooting took place at the corner of Bryan and Branson Streets, he testified that the officers were dumbfounded—"like where in the world did it happen?"  (JA 2073–74.)

Simply put, the police presence on Haymount Hill the night of the January 25 into the early morning of January 26 not only directly conflicts with Williams's account of the shooting, it makes the State's case at trial impossible.  The fact that the jury believed Williams is no longer relevant because his testimony and credibility must be examined in light of the new evidence presented.  No rational juror faced with Williams's already-internally-inconsistent testimony, further discredited by the testimony of Sergeant Campbell, would find Williams to be a credible witness.

> **b.** **New evidence that William Talley murdered Hailey, not McKoy, further supports McKoy's actual innocence.**

Respondent argues that the evidence showing Talley committed Hailey's murder is unreliable. His central argument is that evidence of Talley's possible involvement is not new, and that some of the Court Boys eyewitnesses lack credibility because they could not identify the specific date of the shooting, or that they were motivated to implicate Talley for plea deals. (Resp't Br. pp. 46–48.) These arguments fail: the evidence is "new" and Respondent ignores the circumstances of the strikingly consistent statements given by the eyewitnesses as well as the legal peril several of these eyewitnesses would be in if it was believed that they were falsely implicating Talley.

### 1. The Talley evidence is "new."

For purposes of determining actual innocence, evidence is "new" if it was not presented at trial. The Supreme Court has stated that for an actual innocence case, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— *that was not presented at trial*." *Schlup v. Delo*, 513 U.S. 298, 324 (1995) (emphasis added). This Court reiterated this legal standard in *Finch v. McKoy*,

stating that "[t]o establish an actual innocence claim [petitioner] must support allegations of constitutional error with new reliable evidence that was ***not proffered at trial***." 914 F.3d at 298–99 (emphasis added). The Talley evidence was not presented at trial and is therefore new for the issue of whether McKoy has demonstrated his actual innocence.

Respondent argues that this evidence is not new by pointing to a 1995 letter from McKoy where McKoy says he heard rumors about Talley's possible role while out on bond, "but didn't know for sure cause people was saying Dennis Fort done it." (Resp't Br. p. 47.) Respondent is inappropriately attempting to turn "the burden of proof completely on its head" by blaming McKoy for not bringing forth evidence the State actively concealed throughout his trial. *See Long v. Hooks*, 972 F.3d 442, 464 (4th Cir. 2020) (explaining that it is the State's responsibility to turn over favorable evidence, not the defendant's job to prove himself innocent). Respondent surely knows that any street rumor McKoy heard about Talley would have been substantiated and given credibility by the initial tips the State received that Talley shot Hailey in the Grove View Terrace Housing Complex. (JA 1890, 1894.) The State concealed this evidence from McKoy, which is precisely why the evidence did not come out at trial, and, thus, it is new evidence that must be considered here.

2.    **The State has repeatedly benefitted from its suppression of the Talley tips, and it continues to try and benefit from such suppression before this Court.**

Despite the fact that the first two tips received by police in the investigation of Hailey's murder identified Talley as the shooter, the State continuously and falsely represented that there was no evidence linking Talley to the shooting of Hailey in the investigative file. Based on its suppression of this evidence and false representations to the state courts, Respondent procured orders denying McKoy relief based on evidence that Talley was the shooter. Respondent now asks that this Court defer to the state courts, even though those state courts relied on a limited record in which the State suppressed key evidence.

As noted above, the State suppressed the Talley tips during McKoy's trial despite having an obligation to provide all favorable and exculpatory evidence. (JA 2043–44.) After McKoy was convicted and learned of credible reports that Talley was the shooter, he requested all information that the police had in the investigative record about Talley. In response to this request, Officer Flannery wrote in a memo to an FPD Sergeant that he "was unable to locate any of the mentioned names [including William Talley and his alias "Rat Rat"] Lamont McKoy noted in his letter dated August 22, 1995." (JA 1901.) He further stated that "[a]t no other time did the investigation head in

20

a direction towards a William Talley AKA: Rat-Rat, as proclaimed in the letter received from McKoy." (*Id.*) Despite an explicit request for information related to Talley, the State continued to suppress the Talley tips.

After suppressing the tips naming Talley as Hailey's murderer, the State repeatedly resisted McKoy's request for relief in postconviction proceedings by arguing there was no evidence linking Talley to Hailey's murder. (JA 964.) The State also provided McKoy with a very limited opportunity to develop evidence on his own. At the hearing for his first motion for appropriate relief ("MAR"), McKoy's investigator testified that he only received material related to the Task Force's Investigation into the Court Boys and Talley at 9:00 p.m. the night before the hearing. (JA 937.) McKoy's counsel noted on the record that his efforts were limited by the court's denial of his motion to continue the hearing because of his difficulties in obtaining evidence from the government. (JA 1420.)

As a result of the State's suppression of the Talley tips, the state court denied McKoy's first MAR on the basis that there was an insufficient link between Talley and Hailey's murder. (JA 2600.) The court concluded that "the only similarity of the alleged Talley shooting and the evidence presented in the McKoy prosecution was the fact that both instances involved shooting at an automobile in Fayetteville." (JA 2599.) The court further found that the

Talley shooting took place "at some unknown date and time." (JA 2600.) And the court denying McKoy's second MAR relief adopted these same findings. (JA 1311.)

The concealed Talley tips, however, were the missing link identified by the state courts. Within two days of Hailey being found deceased, Talley was identified as the shooter. (JA 1890, 1894.) This is exactly the timing information the state courts believed missing. Additionally, had these tips not been suppressed, McKoy would have been able to develop additional evidence at trial, including interviewing witnesses while memories (such as their memory of the precise dates) and evidence (such as physical evidence of the direction of Hailey's car) were fresh. As noted in Appellant's opening brief, an overwhelming amount of additional evidence has since been identified that confirms Talley was Hailey's murderer. (Pet. Br. pp. 14–17.) This includes eight eyewitnesses, some of whom identified Talley and Hailey by name, as well as others identifying corroborating evidence (including the location of the shooting, the events of the shooting, and the location of the crashed car). (Pet. Br. pp. 14–15.)

The State's repeated request that this Court defer to the state courts where it had suppressed evidence is inappropriate and inconsistent with the legal standard that actual innocence be evaluated on the totality of evidence.

Additionally, the import of the suppressed tips and Talley evidence can be inferred by the nearly three-decade long concealment. *See Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1227 (9th Cir. 2015) (noting that suppression of exculpatory evidence implicitly recognizes the evidence's value to the defense). And here, that inference is even stronger, as testimony from the district court hearing revealed that Detective Parker, one of the detectives assigned to the Hailey murder, actively protected the drug gang with which Talley was associated. (JA 1997.) Parker was ultimately indicted and pled guilty to obtaining property by false pretenses. (*See* JA 1808–15.) His corruption may very well be the reason that the Talley tips were not revealed until after discovery was ordered by the district court.

### 3. New, reliable evidence shows Talley was the shooter.

Respondent attempts to evade the significance of the new evidence implicating Talley by suggesting that the Court Boys witnesses were motivated by favorable treatment from federal prosecutors when making their statements. (Resp't Br. p. 48.) This argument fails for multiple reasons. First, this argument does not apply to the multiple non-Court Boys witnesses who saw the Talley shooting, nor does it apply to the Talley tips. Second, it ignores the remarkable consistency of the Court Boys statements with the non-Court Boys witnesses, the Talley tips, and the other Court Boys statements. Third,

23

it ignores that at least Craig Roberts did not receive favorable treatment from federal prosecutors.  Fourth, it ignores the inherently credible details of the Court Boys statements.  And finally, it ignores the legal consequences for the Court Boys witnesses if they were not believed by federal prosecutors or investigators.

First, as described in McKoy's opening brief, the evidence identifying Talley as Hailey's shooter is remarkably consistent across eight different eyewitnesses, the two tips that were received just days after the shooting (but only released decades later), and with additional evidence showing Talley used the same type of weapon that killed Hailey.  (Pet. Br. pp. 35–43.)  A summary of how the witness accounts and tips line up with each other is reproduced below.

| Witness | Shooting in Grove View Terrace | Talley was the shooter | Talley shot at the back of a car | Car was found where Hailey's car was found | Car is a blue Honda Accord | Identified Hailey as the victim |
|---|---|---|---|---|---|---|
| January 27 Tip | | ✓ | | | | ✓ |
| January 28 Tip | ✓ | ✓ | | ✓ | | ✓ |
| Bernard McIntyre | ✓ | ✓ | ✓ | | ✓ | ✓ |
| Kelly Debnam | ✓ | ✓ | ✓ | ✓ | | |
| Ronald Perkins | ✓ | ✓ | ✓ | ✓ | | ◍ |
| Anthony Perkins | ✓ | ✓ | ✓ | ✓ | | |
| James Smith | ✓ | ✓ | | | ✓ | ✓ |
| Craig Roberts | ✓ | ✓ | ✓ | ✓ | | ◍ |
| "Jane Doe" | ✓ | | | ✓ | ◐ | |
| "John Doe" | ✓ | | | ✓ | | |

✓: Fully consistent
◍: Some details consistent
◐: Some details inconsistent

Second, the State fails to address the fact that the Court Boys statements were very consistent despite being separated from one another and unable to coordinate the information they are providing. For example, Ronald Perkins was in the Pitt County Detention Center awaiting sentencing when interviewed by investigators. (JA 613.) When Craig Roberts was interviewed, he was in Robeson County Jail in Lumberton, North Carolina, awaiting transfer to the Bureau of Prisons after sentencing. (JA 616.) The two facilities are separated by approximately 150 miles, yet the two individuals gave nearly identical statements implicating Talley in Hailey's murder.

Third, Respondent fails to demonstrate that Craig Roberts had motivation to falsely implicate Talley at the time he was interviewed. Contrary to Respondent's suggestions that the federal witnesses statements were given to curry favor from federal prosecutors, Roberts had already entered a plea, been sentenced, and had his motion for a downward departure on his sentence granted, so he had very little to gain by implicating Talley after his case was fully resolved. (*Compare* JA 613 (identifying Perkins as "Federal Prisoner Awaiting Sentencing") *with* 616 (identifying Roberts as "Federal Prisoner Awaiting Transfer To USBOP").).[5]  Additionally, the State ignores the fact that witnesses frequently receive plea deals in exchange for providing sworn testimony, just like the State attempted do with McKoy's purported "codefendants."

Fourth, it strains credulity to believe that the Court Boys decided to falsely implicate Talley in a murder occurring four years earlier when they knew someone was already convicted for the murder—and not, for example, a crime that had not resulted in a conviction.  The veracity of the Court Boys's

---

[5] This Court can also take judicial notice that Mr. Roberts was sentenced on May 22, 1995 and had already received a downward departure in sentencing based on his cooperation before being interviewed about Talley in June 1995, which further undermines Respondent's argument that the statement was made in search of favorable treatment. *USA v. Perkins et al.*, Case. No. 3:94-cr-00065, Dkt. No. 111 (E.D.N.C. Sep. 13, 1994).

statements is further established by the suppressed tips, which Task Force Investigators were unaware of at the time they interviewed the Court Boys witnesses.[6]  (JA 1951.)

Finally, Respondent ignores the substantial risk that the Court Boys witnesses faced when giving their statements.  Kelly Debnam and Ronald Perkins provided testimony under oath, subject to cross examination,[7] and exposing themselves to possible perjury charges if they were later found to have testified falsely.  (*See* JA 676–87, 384–504.)  Anthony Perkins and others provided statements that, if discovered to be false, subjected them to further criminal liability.  As discussed in Petitioner's Opening Brief, it is a crime to

---

[6] Importantly, while Respondent argues that there is significance to a memo from SBI Agent Scott Fox and a letter from the federal prosecutor John Bennett to his state counterpart, John Dickson, which suggest that the Talley evidence was insufficient to "exonerate" McKoy, (Resp't Br. pp. 49–50), Agent Fox was clear at the district court evidentiary hearing that investigators were unaware of both the evidence against McKoy and that Talley had initially been implicated by the two tips just after Hailey was found deceased. (JA 1951.)

[7] Kelly Debnam and Ronald Perkins both testified and were cross examined on the very facts relevant to this Court's actual innocence gateway determination in this case.  While it is not required that evidence considered under the gateway is subject to this scrutiny, the fact that these witnesses did not waiver while being cross examined further solidifies the credibility of their statements.  *See Finch*, 914 F.3d at 300–01 (4th Cir. 2019) (considering evidence offered in a 2002 affidavit despite the affiant not being subject to cross examination).

make false statements during the course of a federal investigation. (Pet. Br. p. 41.)

Based on the overwhelming and remarkably consistent evidence that Talley killed Hailey, in addition to the totality of the evidence described above, no reasonable juror would find McKoy guilty beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests the Court find that he has demonstrated by a preponderance of the evidence that he is actually innocent and entitled to have his habeas claims considered on the merits. Petitioner further and respectfully requests an oral argument on the issue of his actual innocence.

Respectfully submitted,

/s/ Jamie T. Lau
Jamie T. Lau
N.C. Bar No. 39842
Evan Glasner
Wrongful Convictions Clinic
Duke University School of Law
Box 90360
Durham, North Carolina 27708
Telephone: (919) 613-7764
Fax: (919) 613-7262
E-mail:
jamie.lau@law.duke.edu

John P. Nowak
Amanda Pober
Mark Russell Sperling
Paul Hastings LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

*Counsel for Petitioner-Appellant*

Dated:  September 15, 2022

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,181*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>September 15, 2022</u>          <u>/s/ Jamie T. Lau</u>
                                                          *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of July, 2022, I caused this Reply

Brief of Appellant to be filed electronically with the Clerk of the Court using

the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Kimberly N. Callahan
> Jonathan P. Babb, Sr.
> NORTH CAROLINA DEPARTMENT OF JUSTICE
> Post Office Box 629
> Raleigh, NC 27602
> (919) 716-6576
>
> *Counsel for Appellee*

/s/ Jamie T. Lau
*Counsel for Appellant*